**CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY,**
Petitioner,

v.

**UNITED STATES of America and Interstate Commerce Commission,**
Respondents.

No. 81–2195.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 26, 1982.

Decided April 26, 1982.

Christopher A. Mills, Chicago, Ill., for petitioner.

John J. McCarthy, Jr., I. C. C., Washington, D. C., for respondents.

Before BAUER and POSNER, Circuit Judges, and BARTELS, Senior District Judge.*

POSNER, Circuit Judge.

This case of first impression under the 1980 Staggers Rail Act amendments to 49 U.S.C. § 10905 requires us to decide both statutory and constitutional questions relating to the meaning of the term "fair market value" applied to an abandoned railroad line.

Within ten days after the Interstate Commerce Commission announces its decision to allow a railroad to abandon a line, any person may offer to purchase the line, 49 U.S.C. § 10905(c); and if within another five days the Commission finds that the offeror and the offer are financially responsible, it must suspend its permission to abandon in order to allow time to negotiate the purchase, § 10905(d). If the parties cannot agree on terms, then the Commission must, within 60 days of being requested by either party to do so (§§ 10905(e), 10905(f)(1)(A)), "determine the price and other terms of sale. In no case shall the Commission set a price which is below the fair market value of the line (including, unless otherwise mutually agreed, all facili-

ties on the line or portion necessary to provide effective transportation services)." § 10905(f)(1)(C). Unless the offeror withdraws his offer within ten days of the Commission's determination of the terms of sale, he is bound by that determination, § 10905(f)(2); and once he has acquired the line he may not discontinue service on it for two years, § 10905(f)(4).

The provision whereby the Commission can (and if requested must) force the sale of an abandoned line, and at a price at or above "fair market value," was added in 1980, has not been construed by any court, and is the focus of controversy in this case.

Chicago and North Western Transportation Company applied to the Commission, pursuant to 49 U.S.C. §§ 10903–04, for permission to abandon its 17-mile Lake Geneva line, which runs between the towns of Ringwood in Illinois and Lake Geneva in Wisconsin. It submitted evidence showing that the line was moribund: freight service was down to less than once a week and fewer than 15 passengers were being carried per day. The Commission authorized abandonment. The Geneva Lake Area Joint Transit Commission (GLA), a consortium of towns that is dedicated to preserving commuter rail service, promptly offered $985,000 for the line, which the Commission deemed a responsible offer. C&NW made a counteroffer of $1.9 million. The parties were unable to agree on terms, so the Commission proceeded, on the basis of written submissions, to fix the terms itself within the 60 days given it by the statute. The price the Commission fixed was $1 million. The reason it was so much lower than the price demanded by C&NW was that C&NW valued the property as a rail line, as of course GLA intended to use it, while GLA maintained and the Commission agreed that the relevant value was the value of the property for nonrail use—the use to which it would have been put had it been abandoned. The difference in these valuation theories is the only substantive issue raised by C&NW's petition to set aside the Commission's order fixing the terms of sale.

* Of the Eastern District of New York.

The term "fair market value" in section 10905(f)(1)(C) is not defined in the statute or discussed in the legislative history. If the draftsmen can be assumed to have been careful readers of Judge Friendly's magisterial opinions in the Penn Central reorganization proceeding, which define "market value" as what a liquidating railroad could obtain in the marketplace, see *In re Valuation Proceedings, Etc., Regional Rail Reorganization*, 445 F.Supp. 994, 1016, 1031 (Sp. Ct.R.R.R.A.1977), we might be justified in inferring that "fair market value" means market value in that sense, fairly measured. Perhaps it is also significant that a bill which would have required the Commission to set a price for an abandoned line equal to "at least its fair market value when used to provide rail services," S. 796, § 121(f), 96th Cong., 1st Sess. (1979), failed of passage after hearings in which a witness testified that such a standard would add "an unknown burden to local efforts to acquire rail facilities that I can't assess other than to say I think it is going to make it even more difficult." Railroad Deregulation Act of 1979: Hearings on S. 796 before the Subcomm. on Surface Transportation of the S. Comm. on Commerce, Science, and Transportation, pt. 3, 96th Cong., 1st Sess. 1022 (1979). But on the other hand proposals to make the standard "net liquidation value," see *id.*, pt. 4, at 1350, 1354, 1361, were also rejected; and another section of the Staggers Act, allowing the Commission to force the sale of a line where a railroad is refusing to provide adequate service, directs the Commission to set the price of the line at no lower than "net liquidation value," 49 U.S.C. § 10910(b)(2), in contrast to "fair market value" in section 10905(f)(1)(C).

These obscure and conflicting clues do not help us to decide whether Congress would have wanted the Commission to consider the value of the Lake Geneva line to GLA in setting the terms of sale. But history in a broader sense does. In the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L.No. 94–210, 90 Stat. 127, Congress responded to complaints that the growing financial distress of the nation's railroads, coupled with the Com-

mission's recent adoption of streamlined abandonment procedures, was accelerating the abandonment of railroad branch lines, to the detriment of many shippers and commuters. It responded by creating a program for subsidizing public transit authorities and other entities willing either to support or to acquire and operate branch lines after they were abandoned. See 49 U.S.C. §§ 1654(f)–(p). And to facilitate the transition from commercial to subsidized operation Congress provided that if an offer was made to acquire or subsidize a line for continued rail service, permission to abandon the line would be suspended for up to six months to allow time for a deal to be worked out. See 49 U.S.C. § 1a(6)(a) (1976), recodified as 49 U.S.C. § 10905(b) (1978); S.Rep.No.595, 94th Cong., 2d Sess. 142–43 (1976), U.S.Code Cong. & Admin.News 1976, p. 14; *Chicago & N.W. Transp. Co. v. United States*, 582 F.2d 1043, 1049 (7th Cir. 1978).

But the six-month deadline turned out to impede the statutory objective. It enabled a railroad to hold out for a price that would reflect at least some of the value of continued rail service to the offeror, since if the offeror refused to pay such a price the railroad could threaten to abandon the line in six months. The railroad's hold-up power may not have been very great. Most of the potential offerors were public entities with eminent-domain powers, who could (though not without some inconvenience) wait till the line was abandoned and then reacquire it at its nonrail value—or even condemn it before abandonment and still have to pay, as we shall see, only the value of the line to the railroad rather than the greater value to the condemnor. And the offeror could make his own threat to walk away from the negotiations and thereby consign the railroad to an alternative—abandonment—that would give the railroad less money than if it had come to terms with the offeror. Still, the bargaining situation we have described—what economists call bilateral monopoly—would tend to yield a price for an abandoned line that was higher than if the railroad were forced to

sell at a price based on the most valuable nonrail use of the line, though lower than if the railroad could extract the last penny of surplus value from the offeror.

Congress did not want the railroads to have any hold-out power in negotiating with entities planning to continue passenger rail service on a subsidized basis. That is why it amended section 10905 in 1980 to allow—indeed require—the Commission to fix the price of the sale if the parties could not agree. See S.Rep.No.470, 96th Cong., 1st Sess. 40 (1979). The purpose of the amendment would be frustrated if the Commission were required to consider the value of the line to the offeror, for that would give the railroad an approximation to what it was able to get when, under the previous statute, it could threaten to abandon the line after six months. When we consider how the Staggers Act amendments to 49 U.S.C. § 10904 expedite abandonment proceedings (see S.Rep.No.470, supra, at 39), to the great benefit of the railroads, and when we recall that the subsidies used to continue rail service over abandoned lines are (in part at least) federal as a result of 49 U.S.C. §§ 1654(f)–(p), we are even more convinced that Congress did not intend, by using the term "fair market value," to allow the railroads to extract from potential offerors a share of the subsidies that the offerors have earmarked for continuing service on lines that the railroads can now—by virtue of the very Act—abandon with such ease.

■ We would be deflected from this view only if we thought that not letting the railroad share in the line's value for continued rail service after abandonment would violate the taking clause of the Fifth Amendment. The government may not force a railroad to operate a line at a loss for an indefinite period of time, see, e.g., *Brooks-Scanlon Co. v. Railroad Comm'n*, 251 U.S. 396, 399, 40 S.Ct. 183, 184, 64 L.Ed. 323 (1920); *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 611 F.2d 662, 666–67 (7th Cir. 1979), and it would seem to follow that if, as here, the right to abandon is conditioned on the railroad's willingness to sell the abandoned line at a price fixed by the Interstate Commerce Commission, that price must not fall short of just compensation. If the line had a scrap value of $1 million, it would not do for the Commission to tell the railroad, "we are going to force you to sell the line for $100,000, and if you don't like that price we will refuse to let you abandon the line until you have lost another $900,-000, at which point you'll cry 'uncle.'" It does not matter that the Commission does not want to take the line for the federal government but is instead acting in effect as agent for the Geneva Lake Area Joint Transit Commission. The government cannot escape its constitutional obligation of just compensation by giving away the property that it condemns.

But at least as a first approximation compensation is "just" when it gives the property owner what he would have had but for the taking. E.g., *United States v. Reynolds*, 397 U.S. 14, 16, 90 S.Ct. 803, 805, 25 L.Ed.2d 12 (1970). But for the sale of the Lake Geneva line to GLA at a price fixed by the Commission, C&NW would have abandoned the line—that is, would have sold the right of way and track and other property and facilities for nonrail uses—and the price it would have received would have been the nonrail market value of these assets, which is what the Commission tried to estimate when it fixed the sale price at $1 million. If the condemnee is entitled to more than what he could get for his property in the marketplace, one wonders why government would ever use or even threaten to use its condemnation powers rather than just bargain to whatever price reflected the respective bargaining power of each party.

■ This analysis would be uncontroversial we imagine if the railroad line had been taken for some distinctively governmental use—for example, as a military facility. The fact that the line might be more valuable to the government in its use than to the owner in his would be irrelevant to the amount of compensation due. See, e.g., *United States v. Miller*, 317 U.S. 369, 375, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943). But the

present case is unusual because the taking by the government is, at least superficially, for the purpose of continuing the use to which the private owner had put the property. We are not sure why this should make a difference. Whatever the intended use by the government, the condemnee who asks for more than what the property would have been worth to him if the government had not wanted the property is trying to engross "hold out" values—the very thing, one might have thought, that the eminent-domain power was intended to excuse the government from having to pay. (For a good general discussion see Note, *Valuation of Conrail under the Fifth Amendment*, 90 Harv.L.Rev. 596 (1977).)

It is true that Judge Friendly, writing for the Special Court in the Penn Central case, reserved the question whether, when a railroad line that is not commercially viable is condemned for the purpose of continuing it in service, the requirement of just compensation is satisfied by giving the railroad no more than what the line is worth to it—its nonrail salvage value, in other words—even though the property will remain in use as a railroad line and will be worth more to the user because of that fact. See *In re Valuation Proceedings, supra*, 445 F.Supp. at 1029–30; and for a negative answer to the question see *In re Port Auth. Trans-Hudson Corp. (PATH)*, 20 N.Y.2d 457, 467–70, 285 N.Y.S.2d 24, 29–32, 231 N.E.2d 734, 738–40 (1967). But we read Judge Friendly to be concerned that measurement problems created by the vastness of the Penn Central might make it infeasible to determine the hypothetical net liquidation value of that rail system. See 445 F.Supp. at 1031. Put those problems aside and we think he would adopt salvage value as the constitutional minimum. That is in fact what the Special Court has done in a subsequent opinion. See *In re Valuation Proceedings, Etc., Regional Rail Reorganization*, 531 F.Supp. 1191, 1210–15 (Sp.Ct.R.R.R.A.1981). There are no serious measurement problems under section 10905. The statute relates to the abandonment of individual branch lines and the nonrail market value of an individual line is readily determinable.

Setting aside measurement problems, we think it irrelevant whether private property is taken for a new use or to continue an old one, and even question whether this is a meaningful distinction. If C&NW owned a hospital that was losing money and had no prospects for profitable operation, and the State of Wisconsin condemned it for a public hospital, C&NW would not be entitled to the value of its property as a hospital. It would have no value to C&NW as a hospital. It would have value to the state only because the state could use its taxing powers to force state residents to defray the losses. In these circumstances the change from private to public ownership would be as distinctive a change in the economic character of the hospital as if it had been taken for use as an artillery range.

 But to all this it may be replied that GLA, whatever its source of funds, was a potential purchaser of the Lake Geneva line and this shows that the line had a market value which the statute prevented C&NW from realizing. We agree that a buyer's willingness to pay a high price is not an invalid indication of market value just because he is subsidized. The government could not refuse to pay the market value of western farmland that it condemned, merely because the value had been enhanced by governmentally subsidized water projects in the area. See *United States v. Reynolds, supra*, 397 U.S. at 16–17, 90 S.Ct. at 805. This result is required if for no other reason simply to keep the valuation process manageable. But it is not clear that GLA really was a potential purchaser, at least at any price higher than the salvage value of the Lake Geneva line. It is a public entity that has or could easily be given the power of eminent domain, and if it exercised that power the price it would have to pay would be limited to what C&NW could get from other prospective purchasers who did not have eminent-domain power, none of whom would continue the line in rail use. Cf. *United States v. Miller, supra*, 317 U.S. at 375, 63 S.Ct. at 280; *In re Valuation Proceedings, supra*, 531 F.Supp. at 1324–33; *In re Valuation*

*Proceedings, supra*, 445 F.Supp. at 1040–41; but cf. *In re Valuation Proceedings, Etc., Regional Rail Reorganization*, 425 F.Supp. 266, 273 (Sp.Ct.R.R.R.A.1976). This conclusion assumes that Illinois and Wisconsin just-compensation principles are similar to, or at least not more generous than, federal principles, and the parties have not addressed that issue. But if C&NW wanted to show that were it not for the statute GLA would have been a prospective purchaser at a price higher than the one the Commission fixed, it had the burden—which it has not attempted to carry—of producing some evidence in support of that theory.

Up to this point we have assumed that GLA intends just to continue the existing service on the Lake Geneva line. But it would be unrealistic to suppose that GLA was willing to pay $1 million just so that 15 passengers could continue commuting. The railroad, we assume for perfectly good commercial reasons, had let the commuting service virtually die and GLA wants to resurrect it. That is a change in use—which serves, incidentally, to distinguish the *PATH* decision, *supra*.

We have also assumed that the Commission could, if it had to, feasibly determine what the Lake Geneva line was worth to GLA. But an additional support for our interpretation of the statute and the Constitution is the unmanageability of such an inquiry. The analysis that C&NW made to fix the rail value of the Lake Geneva line was oriented to the cost of recreating that line. This has no necessary relation to what GLA would be willing to pay to preserve the line for the benefit of the passengers that are using it and those who may be induced to use it in the future. On that question no evidence was presented. This is not surprising. The maximum value of the line to GLA is a function very largely of the political muscle of GLA's constituents—an area of inquiry that courts, and even the ICC, at least when sitting as a valuation tribunal with 60 days to complete its work, are poorly equipped to explore. That value, moreover, would only be a ceiling on what just compensation might be thought to re-

quire. It would not measure that value exactly. C&NW would not be entitled as a matter of constitutional law to wring the last drop of surplus value out of GLA—that would make condemnation a truly meaningless power of government, by giving the condemnee the highest price that he could hope to obtain if there were no power of condemnation. Thus, even if the value of the line to the purchaser rather than to the seller were constitutionally relevant, the constitutional minimum would presumably lie somewhere in between the two values. Unfortunately, there is no basis in economics or any other body of thought for deciding just where. Cf. *In re Valuation Proceedings, supra*, 445 F.Supp. at 1015; Stigler, The Theory of Price 207 (3d ed. 1966). The Commission was driven to the value concept it used almost as an imperative of administrability, irrespective of any other factor.

■ Our conclusion that GLA was entitled to acquire the Lake Geneva line at its salvage value may seem harsh, especially with regard to that part of the right of way—some 55 percent of the total—to which C&NW has title by adverse possession. Under state law, this land would revert to its previous owners (those from whom the railroad acquired rights by adverse possession) in the event the land ceased to be used as a railroad right of way; and since it would therefore have been worth nothing to the railroad if it had abandoned the line, the Commission valued it at nothing in computing the line's fair market value even though it will continue to be used, by GLA, as a railroad right of way. But we see no escape from this result once it is conceded that the proper standard, both statutory and constitutional, is fair market value. The value of the land was properly set at zero in this proceeding because that is the value that the land would have had to C&NW had it been permitted to abandon the Lake Geneva line. To give it a positive value would be to allow the railroad to participate in a value that is created by a decision to continue service on a subsidized basis. Neither the statute nor

the Constitution requires the Commission to grant it such participation.

 Turning briefly to the only other issue in the case, we think the procedure whereby the Commission determined the fair market value of the Lake Geneva line was adequate. C&NW does not challenge the constitutionality of the 60-day deadline for the Commission's valuation. That concession, and another (its brief in this court states, "It may be that the fault lies with the exceedingly tight 60-day time limit"), pretty much puts it out of court. Sixty days permit only summary procedures. The Commission acted on a written record based on the submissions of the parties and their written comments on each other's submission. No doubt there would have been time for some kind of oral hearing—preliminary-injunction proceedings, after all, typically include such hearings even though the time pressures are often as great as the 60-day deadline made them in this case. But in oral argument in this court C&NW's counsel disclaimed any desire to cross-examine GLA's witnesses. This disclaimer implies that oral hearings would have served no purpose. Since the benefits of additional procedural safeguards would have been zero, we need not concern ourselves with what the costs would have been; the procedure was constitutionally adequate under *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

The brevity of the statutory procedure suggests, incidentally, another reason why the measure of value used by the Commission was constitutionally permissible. While as we said earlier the Fifth Amendment forbids the Commission to drag out abandonment proceedings indefinitely, it does not require the Commission to act as promptly as the 1980 amendments to sections 10904 and 10905 compel it to do. Cf. *New Haven Inclusion Cases*, 399 U.S. 392, 491–92, 90 S.Ct. 2054, 2109, 26 L.Ed.2d 691 (1970). Those amendments have given the railroads a faster abandonment procedure than the Fifth Amendment entitles them to and it is reasonable that they should be asked to give up something in return—the opportunity to engross values created by a political process that weights the preferences of railroad passengers more heavily than the market does.

AFFIRMED.