ILLINOIS CENTRAL GULF RAILROAD
CO., Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.

Cisco Cooperative Grain Company,
Intervening Respondent.

No. 82–2594.

United States Court of Appeals,
Seventh Circuit.

Argued June 9, 1983.
Decided Sept. 15, 1983.

Richard M. Kamowski, Ill. Central Gulf R.R. Co., Chicago, Ill., for petitioner.

Sidney L. Strickland, Jr., I.C.C., Washington, D.C., for respondents.

Before CUMMINGS, Chief Judge, BAUER, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.

CUMMINGS, Chief Judge.

This is an action to set aside several decisions of the Interstate Commerce Commission ("ICC") in Docket No. AB–43 (Sub-No. 85F), *Illinois Central Gulf Railroad Company—Abandonment between Cisco and Green's Switch, Illinois.* In January 1982, Illinois Central Gulf Railroad Company ("ICG") filed a notice of intent to abandon 13.41 miles of railroad line from Cisco to Green's Switch, Illinois, and a complete abandonment application was filed in February 1982. On May 11, 1982 the ICC served its decision granting ICG's abandonment application. Under 49 U.S.C. § 10905, when the Commission approves the abandonment of a rail line, any financially responsible person willing to provide continued rail service over the line may file an offer to purchase the line within 10 days. Cisco Cooperative Grain Company ("Cisco") did so on May 21; Illinois Power Company ("IP") also filed an offer of financial assistance to acquire a 2.3 mile segment of the line, but conditioned its offer on rejection of Cisco's offer for the entire segment.

On May 24, the ICC found Cisco to be financially responsible and its offer to be bona fide, and accordingly postponed the issuance of the certificate of abandonment to give the parties a chance to negotiate price, or to request the Commission to set the terms and conditions for the purchase. See 49 U.S.C. § 10905(d). The ICC's decision was served May 26. On May 25, between the issuance and service of the ICC

decision, ICG filed a motion to dismiss Cisco's offer to purchase the line. Because the ICC decision had already issued, the Commission treated ICG's motion as an appeal, 49 C.F.R. § 1011.7(b)(1), which was denied on July 15. Negotiations between Cisco and ICG were unsuccessful and on June 25, Cisco asked the ICC to set the terms for the sale. Cisco estimated the value of the line to be $269,939 on the basis of an independent appraisal by Mr. Craig Burroughs, President of the Prairie Central Railway Company, of the net salvage value of the track materials, and an independent appraisal by Mr. Verne Roby of Roby & Associates, real estate appraisers, of the value of the land for its highest and best nonrail use.

On August 12, ICG disputed Cisco's appraisal and requested a sale price of $663,-286 based on the verified statements of two of its employees, Jeffrey Wells, Consolidation Engineer, and John Wyatt, Area Manager of Special Projects. On August 24, the ICC served a decision ordering ICG to sell the line to Cisco for $279,122.40. The Commission gave Cisco 10 days to accept the terms and set the closing date for November 22, 1982.

Accordingly, Cisco on September 3 accepted the offer, but also petitioned the ICC to modify the closing date. ICG objected that Cisco's acceptance was "conditional" and therefore invalid. Cisco's petition was based on the fact that it had appealed an adverse ICC decision in a related case, see *Cisco Cooperative Grain Co. v. ICC*, 714 F.2d 401 (1983), also decided today, and did not want to prejudice that action by closing before the other case was decided on appeal. The Commission on November 15, however, extended the closing date because of ICG's appeal of the August 24 order setting the terms and conditions of sale, holding that it would be unfair to require the parties to consummate the sale before this Court had the opportunity to review the Commission's actions in setting the price.

First, ICG challenges as arbitrary and capricious the May 26 decision finding Cisco to be financially responsible and its offer

bona fide. Second, ICG challenges as violative of its due process right to be heard the July 15 decision treating its motion to dismiss Cisco's offer as an appeal. Third, ICG challenges as being outside the scope of the ICC's authority the November 15 decision extending the closing date. Finally, and most importantly, the ICG challenges as arbitrary and capricious the August 24 decision setting the purchase price.

### A. *The May 26 decision*

■ ICG objects to the ICC decision on two grounds: first, that Cisco did not present enough evidence to show it was financially responsible, and second, that its petition did not present enough detail to constitute a bona fide offer. We reject both arguments. Section 10905(d) allows the ICC to postpone issuance of a certificate of abandonment when a financially responsible person makes a bona fide offer of assistance to enable rail transportation to be continued over the rail line in question. Both the finding of financial responsibility and the finding that the initial offer was bona fide are preliminary in nature, and simply constitute grounds for encouraging further negotiation. The purpose of the showing required by Section 10905(d) and 49 C.F.R. § 1121.38 is to prevent unjustified delays of railroad abandonments by screening out frivolous offers made by persons who are unable to fully compensate the railroad for its property. In this case, Cisco submitted annual financial statements for the past three and one-half years in accordance with 49 C.F.R. § 1121.38(c)(2)(iii) which requires "information" demonstrating financial resources; contrary to ICG's argument, the regulation does not require an "explanation" of financial resources. The ICC itself was perfectly capable of concluding from the information provided that Cisco was financially responsible. In addition, in accordance with Section 1121.-38(c)(2)(v), Cisco explained why its estimate of net liquidation value differed from ICG's by relying on a professional appraisal it had

conducted for this purpose. Although Section 1121.38(e)(4) requires a statement of the manner in which operations will be continued over the line, including a proposed operating agreement, Cisco had not yet executed such an agreement, and thus could only indicate its intention to contract with Prairie Central Railway Company. In light of the preliminary nature of the required showing, the May 26 decision based on the above information was neither arbitrary nor capricious.

### B. *The July 15 decision*

Section 10905(c) gives any person 10 days from the date of service of a decision approving abandonment to offer to purchase the line. Section 10905(d) gives the ICC 15 days after publication of the decision— which occurs when the decision is served [1] —to find that the offer is bona fide and the offeror financially responsible. Cisco filed its offer on May 21, 10 days after the abandonment decision was served on May 11. The ICC thus had 5 days to rule on the offer. It issued its ruling on May 24, but served it on May 26. ICG argues that the ICC's failure to consider ICG's May 25 motion to dismiss the Cisco offer before it issued its May 26 decision violated ICG's due process right to be heard.

■ It is obvious that the reason ICG's pleading was not considered was because the ICC decision had been issued on May 24, a day before the ICG pleading was received. Given the fact that by statute the ICC had only 5 days in which to rule, it is untenable to claim that it purposefully intended to exclude comment by ICG on the matter before it. Indeed, the ICC did consider ICG's objections to Cisco when it treated the motion by ICG as an appeal. ICG argues that 49 C.F.R. § 1011.7(b)(1) subjects appeals to a very strict standard; they will only be granted in "exceptional circumstances to correct a clear error of judgment or to prevent manifest injustice." But ICG

---

1. As is customary, each of the ICC decisions discussed herein provides that it is effective on the date served.

does not specify exactly how consideration of its pleading before the May 26 decision would have changed the result. As described in part A *supra*, the ICG objections essentially challenged the sufficiency of Cisco's evidence. Despite the "stricter" standard on appeal, the ICC Chairman makes clear in his July 15 opinion that he reviewed the record and found sufficient evidence to support the May 26 decision (Jt.App. 37–38). Thus this procedure provided an adequate opportunity for ICG's challenges to be considered, and as it turned out, rejected, in light of Cisco's presentation.

### C. *The November 15 decision*

ICG argues that by petitioning the ICC for a modification of the closing date, Cisco "conditioned" its acceptance of the terms and conditions of sale, and the ICC was thus bound by statute immediately to issue a certificate of abandonment. 49 U.S.C. § 10905. We disagree. The ICC specifically found that Cisco's acceptance of the terms was absolute (Jt.App. 84); its petition for an extension of the closing date was based on its appeal of a related decision that would, if reversed, present the opportunity to purchase the line under a different statutory Section, *i.e.*, the feeder railroad development program under Section 10910. See *Cisco Cooperative Grain Co. v. ICC,* 717 F.2d 401 (1983). Cisco merely intended to preserve its rights during the appeal.

■ Because Cisco's acceptance was absolute, the ICC was under no statutory obligation to issue a certificate of abandonment immediately. In its discretion, the Commission decided to extend the closing date until this appeal was decided in order to give Cisco an opportunity to withdraw if this Court remanded and the ICC's reconsideration resulted in a higher purchase price. The ICC did not abuse its discretion in so doing.

### D. *The August 24 decision*

ICG does not challenge the ICC determination of the salvage value of the line at

$126,420. It does, however, challenge the valuation of the real estate at $172,920.40. Cisco's independent appraiser found that the highest and best nonrail use for the land was for sale to the abutting owners for use as farmland, and valued the land at $3,000 per acre for all 160.05 acres.[2] He reduced the $3,000 per acre figure (1) by $800 per acre to reflect the cost of restoring the land to farmland by removing the ballast, brush and trees, and grading or reshaping the land, (2) by 20% of the resulting figure or $440 per acre, because of the limited productivity of the land for farming even after the land was restored, and (3) by $602.80 per acre to reflect a three-year sales period and the fact that some parcels might never sell. The resulting fair market value is $1,157.20 per acre, which when multiplied by 160.05 acres amounts to $185,210 and was Cisco's valuation of the real estate.

ICG's $525,319 real estate valuation was done by an employee with real estate and appraisal experience (Jt.App. 53–76). His verified statement specifically challenged several aspects of Cisco's submission. ICG essentially agreed with Cisco's unadjusted figure of $3,000 per acre, but because that figure came from comparable land sales over a three-year period, ICG increased the figure by $500 per acre to reflect inflation. ICG argued that $800 was too much for restoration and suggested instead a $400 figure. In addition, ICG argued that while the land could be sold to abutting owners, it did not necessarily have to be used for growing crops, but could serve other farm purposes and therefore should not be devalued by $440 per acre for limited productivity. Finally, ICG argued that the 7.97 acres of land located within the boundaries of two towns should be valued as commercial rather than as farm property, at $10,889 per acre, or approximately $86,790.

The ICC accepted Cisco's estimate in full. The opinion indicates that the ICC read ICG's submission because it states that ICG's valuation is based "on comparable sales of land during the past 3 years, ad-

2. The typical width of the property is approxi- mately 100 feet.

justed upward to reflect inflation [and further adjusted] to account for the cost of restoring the right-of-way and for unmarketable parcels" (Jt.App. 79). However, it is clear from the opinion that the Commission believed ICG's figures were based on an incorrect "land valuation methodology." The ICC apparently believed that ICG valued the land on the assumption that it could be sold "as an access or a roadway," or "as a single parcel;" the ICC believed ICG had submitted an "assemblage value * * * appropriate if property has a market as a corridor for other than rail use." Since there was no evidence of any interest in the corridor for nonrail use, the ICC rejected ICG's appraisal in its entirety.

■ This type of informal agency action must be upheld if, based on the record before it, the ICC decision is not arbitrary or capricious. The ICC must consider all relevant factors in arriving at its decision and provide a reasoned explanation for that decision—that is, it must give "an adequate explanation of the connection between the record before it and the choice it makes." *City Fed. Sav. & Loan Ass'n v. Federal Home Loan Bank Bd.*, 600 F.2d 681, 688 (7th Cir.1979). In this case, the ICC accepted Cisco's figures because it approved of its methodology, and rejected ICG's figures because it assumed they were based on valuing the land for use as an access or roadway. For this reason, the ICC did not resolve the contested valuation issues. The assumption that ICG's figures were based on an inappropriate methodology is not supported by the administrative record. ICG's appraisal contests the restoration costs, the reduction in productivity, the assumption that it will take up to three years to sell the land, and the value of the property located in commercial areas. In discussing restoration costs, ICG's appraisal rejects Cisco's figures for two reasons: first, because recent ICG salvaging projects have cost not $800 but between $200 and $600 an acre; and second, because possible use of the land for access or as a roadway would eliminate much of the restoration cost (Jt.App. 59). This mention of "access or roadway" comes in the middle of the appraisal, takes up one

page, and is clearly offered by ICG as an alternative reason for rejecting Cisco's restoration costs. But the ICC assumed the entire appraisal was based on selling the land for use as a corridor, for access or for a roadway. Based on this record, it was arbitrary and capricious to find that this assumption underlay ICG's entire analysis and thereby invalidated it. The ICC's choice—accepting all of Cisco's figures—was therefore based on an erroneous reading of the record.

The ICC attempts in its brief to explain the Commission's decision by analyzing the conflicting figures and justifying Cisco's appraisal (Br. 17–20). The ICC argues in brief that the Commission weighed the conflicting evidence and "obviously gave more weight to the full, detailed appraisal of [Cisco's] independent certified land appraiser than to the railroad's more generalized rebuttal evidence" (Br. 18). But there is no evidence in the ICC opinion that the agency did anything more than reject ICG's figures on the basis of a mistaken notion as to its methodology. Although the ICC's explanation in brief may be plausible as an afterthought, it cannot substitute for the explanation given by the ICC in its opinion. See *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136.

Because the ICC's August 24 decision cannot be sustained on the present record, we set it aside and remand this case to the Commission for reconsideration of the value of the land; the remaining orders are affirmed.