**IOWA TERMINAL RAILROAD CO., Petitioner,**

*v.*

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Iowa Traction Railroad Co., Intervenor.**

**No. 87–1051.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 9, 1987.

Decided Aug. 9, 1988.

Peter A. Greene, with whom R. Hale Foote, Washington, D.C., was on the brief, for petitioner.

Laurence H. Schecker, Atty., I.C.C., with whom Robert S. Burk, Gen. Counsel, John J. McCarthy, Jr., Deputy Associate Gen. Counsel, I.C.C., and Catherine G. O'Sullivan and Marion L. Jetton, Attys., U.S. Dept. of Justice, Washington, D.C., were on the brief, for respondents.

Thomas F. McFarland, entered an appearance for intervenor Iowa Traction R. Co.

Before EDWARDS, SILBERMAN and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Iowa Terminal Railroad Company petitions for review of an Interstate Commerce Commission order establishing the sale price for a 10.4–mile section of Iowa Terminal's line. The Commission issued the order pursuant to a statute that permits a prospective purchaser to require the sale of railroad facilities that would otherwise be abandoned. Because we find certain of the Commission's valuations to be unsupported by either the evidence or the statute, we remand them to the Commission for further consideration.

## I. Background

On March 7, 1986, Iowa Terminal Railroad Company ("Iowa Terminal") filed an application with the Interstate Commerce Commission ("ICC" or "Commission") to abandon its entire 26.1–mile electric railroad line in Cerro Gordo and Floyd Counties, Iowa. Petitioner's decision to abandon the line brought the railroad within the terms of a detailed statutory framework designed by Congress to keep viable lines in operation.

Because of the importance of rail transportation, Congress has declared that railroads may not terminate service except with prior approval of the ICC, 49 U.S.C. § 10903 *et seq.* (1982), or pursuant to an exemption by the ICC from the approval provisions of the Interstate Commerce Act. 49 U.S.C. § 10505. Furthermore, within ten days after the ICC publishes a decision allowing a railroad to abandon a line, any person may offer to purchase it. 49 U.S.C. § 10905(c). If the ICC finds that an offer is bona fide and the offeror financially responsible, it must suspend its permission to abandon in order to allow the parties to negotiate a sale. 49 U.S.C. § 10905(d).

In the event the parties cannot agree on terms, either party may ask the ICC to determine the price and other terms of sale. 49 U.S.C. § 10905(e). The Commission shall "[i]n no case ... set a price which is below the fair market value of the line (including ... all facilities on the line or portion necessary to provide effective transportation services)." 49 U.S.C. § 10905(f)(1)(C). Unless the offeror withdraws his offer within ten days of the ICC's determination of the terms of the sale, the offeror is bound by that determination. 49 U.S.C. § 10905(f)(2). Once the line has been purchased, the purchaser may not discontinue service for at least two years. 49 U.S.C. § 10905(f)(4).

In this case, the ICC granted petitioner permission to abandon the line. Shortly thereafter, on September 16, 1986, Iowa Traction Railroad Company ("Iowa Traction") offered $263,161 to purchase a 10.4–mile portion of petitioner's line known as the Mason City Division. The ICC accepted the offer as bona fide and stayed the abandonment certificate to permit the parties to complete the transaction. The companies were unable to reach an agreement and, pursuant to section 10905(e), Iowa Traction asked the ICC to set the purchase price.

After reviewing written submissions by both railroads, the ICC determined that the proper price for the Mason City Division was $319,500. *Iowa Terminal Railroad Co.,* Docket No. AB–269 (Jan. 8, 1987) (*"Valuation Decision"*), Joint Appendix ("J.A.") at 384. Iowa Traction accepted the terms, J.A. at 398, and Iowa Terminal filed a petition for review. It also petitioned the ICC to stay the sale pending review, which the ICC declined to do. *Iowa Terminal Railroad Co.,* Docket No. AB–269 (Mar. 24, 1987) (*"Denial of Stay"*), J.A. at 468.

Petitioner contends that the ICC substantially undervalued the Mason City Division in violation of its statutory obligation to set a price no lower than the "fair market value" of the line. Indeed, petitioner argues that the price set by the ICC is so woefully inadequate that it constitutes an "unconstitutional taking" in violation of the Fifth Amendment to the United States Constitution.

## II. Discussion

### A. The Meaning of "Fair Market Value"

■ The ICC establishes the "fair market value" of rail facilities under 49 U.S.C. § 10905(f)(1)(C) by calculating the net liquidation value of the assets for their "highest and best nonrail use." *Chicago & North W. Transp. Co.,* 363 I.C.C. 956, 958 (1981), *aff'd,* 678 F.2d 665 (7th Cir.1982). In a thoughtful analysis of the statute, which we here adopt, the Seventh Circuit concluded that the ICC's application of section 10905 was appropriate, and that the sales price established in accordance with its terms met the constitutional obligation to provide the seller with just compensation. *Chicago & North W. Transp. Co. v. United States,* 678 F.2d 665 (7th Cir.1982). Because the provisions of section 10905 "generally affect only those lines which ...

have been found not economically viable," a railroad intent on abandoning a line is fairly compensated when it receives "what [it] would have had but for the taking," namely, "the nonrail market value of [its] assets." *Id.* at 668.

To assist the Commission in determining the net liquidation value of rail facilities, ICC regulations provide that the prospective purchaser must submit an estimate of their value and "provide reasons why its estimates are correct...." 49 C.F.R. § 1152.27(h)(3) (1987). The seller then submits a reply. 49 C.F.R. § 1152.27(h)(4) (1987). Because the Commission must render its decision within sixty days from the date on which a request for ICC intervention is made, 49 U.S.C. § 10905(f)(1)(A), the price and other terms of sale will normally derive entirely from these written submissions. *Chicago & North W.*, 678 F.2d at 671. Nevertheless, the buyer "has the burden of proof as to all issues in dispute," 49 C.F.R. § 1152.27(h)(3), and must present sufficient evidence of the line's value to meet that burden.

### B. The Value of the Mason City Division

■■■ Petitioner argues that the ICC undervalued the Mason City Division's right-of-way, track, land, buildings, and rolling stock. In considering each element of the valuation order, we are mindful that the ICC's decision "must be upheld if, based on the record before it, the ICC decision is not arbitrary or capricious." *Illinois Cent. Gulf R.R. Co. v. ICC*, 717 F.2d 408, 412 (7th Cir.1983). While we may not substitute our judgment for that of the agency, we must nevertheless satisfy ourselves that the ICC considered all relevant factors and provided a reasoned explanation for its decision. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

#### 1. *The Right-of-Way*

Petitioner owns three sections of the railroad's right-of-way in fee simple, and argues that the ICC erred in concluding that they have no value. We agree with peti-

tioner in the case of two of the rights-of-way, but not in the case of one it had agreed to donate, in the event of an abandonment, to the Cerro Gordo County Conservation Board. Letter of Agreement dated October 13, 1986 ("Letter of Agreement"), J.A. at 319–20.

■■■ Petitioner asserts that as the abandonment did not take place, the proposed gift should be viewed as a nullity; and as Iowa Traction would be using the right-of-way in its operations, it should be required to pay for it. Section 10905 requires, however, that the sales price be calculated on the basis of what the seller would have realized from the sale of the assets had the line in fact been abandoned. Nobody disputes that "but for the taking" in this case, petitioner would have transferred the right-of-way to the Conservation Board without compensation. It is irrelevant that Iowa Traction will realize a minor windfall because, as the Seventh Circuit noted in *Chicago & North Western*, "[t]he purpose of [section 10905] would be frustrated if the Commission were required to consider the value of the [right-of-way] to the offeror" as part of an operating railway rather than the price the seller would have received from the sale of the right-of-way for nonrail uses. 678 F.2d at 668.

■■■ Petitioner argues, on appeal, that it is at least entitled to the benefit of the tax savings it would have realized had it been able to deduct the value of the right-of-way as a charitable gift in its income tax returns. Reply Brief for Petitioner at 15. Such a position stretches the statute too far. Subsection 10905(f)(1)(C) requires the ICC to determine the fair market value of an asset to a nonrail purchaser, not its after-tax value to the vendor.

■■■ We have trouble, however, with the ICC's decision to ascribe no value to a section of fee simple right-of-way between mileposts 0.0 and 1.5. The ICC discounted written offers of $21,500 and $7,000 for portions of the right-of-way because they were "vague, have expired, and include more land and assets than the [right-of-way]." *Valuation Decision*, J.A. at 388.

Instead, the ICC held that the land was worth only $2,500, which the ICC claimed to be petitioner's own assessment of the interest's value. *Id.* The ICC then concluded that Iowa Traction need not pay even $2,500 because "street crossing removal and resurfacing costs will substantially exceed this amount." *Id.*

The ICC misinterpreted petitioner's valuation of the interest. In the estimate it submitted to the Commission, petitioner referred to the two written offers for distinct portions of the right-of-way, to an inquiry by a third buyer interested in acquiring another portion of the right-of-way for $1,500, and then placed a value of $2,500 on "the balance of the right-of-way from milepost 0.0 to approximately milepost 1.5." J.A. at 275. Adding these figures to the railroad's estimate that *the balance* of the right-of-way not covered by the offers and inquiry is worth $2,500, we find that petitioner valued the entire 1.5–mile stretch at $32,600.

In recalculating the value of the right-of-way, the Commission should again consider the written offers submitted by petitioner and determine with some precision the cost of any street-crossing removal and resurfacing petitioner would have been obliged to undertake on abandonment. The fact that the offers have expired is of little relevance absent evidence that the value of the land has since decreased.

Lastly, we find no support for the ICC's conclusion that the fee simple right-of-way between mileposts 2.5 and 6.5 has no value. Petitioner submitted evidence that it had received an offer to buy this and other land for $92,000. J.A. at 274–75. The ICC addressed the offer for the first time in its appellate brief, where it asserted that the offer merited "little weight" because it covered more than simply the right-of-way. Brief for Respondents at 25. While we agree that the offer is not as neatly tailored as it might be, this defect does not by itself support the Commission's conclusion that the four-mile right-of-way has no value whatsoever.

### 2. *Track and Ties*

Petitioner argues that the ICC committed a "glaring error" in placing a net value of $50,529 on track and ties. Brief for Petitioner at 21. The Commission based this figure on an Iowa Department of Transportation ("IDOT") estimate that the tracks had a scrap value of $52,359 after removal costs, and that the cost of removing the ties would exceed their salvage value by $1,830. At the same time, the ICC dismissed three bids petitioner had received for the rail and other track materials that indicated steel scrap values ranging from $58,222 to $73,194. The ICC rejected the first because removal costs were not specifically identified; the second, because it was phrased as "depending on market value at such time" as the transaction would actually take place; and the third, because removal costs were based on the cost of removing rail from a section of the line not subject to the sale. *Valuation Decision,* J.A. at 388, 389.

Petitioner argues that the ICC should not have rejected this evidence and, particularly, that the ICC's attempt to discredit the removal costs outlined in the third bid "is simply meaningless" because the track on which the estimate was based is only thirty miles from the Mason City Division. Brief for Petitioner at 22. These shortcomings, however, were not decisive; they merely helped persuade the Commission that the IDOT estimate submitted by Iowa Traction was "the most complete and credible evidence of record." *Valuation Decision,* J.A. at 389. This decision was not arbitrary or capricious, particularly because Iowa Traction's submission had been prepared by the IDOT and shared none of the deficiencies that caused the ICC to discredit petitioner's bids.

Nor can we fault the ICC for its approach to the valuation of the railroad ties. The ICC agreed with the IDOT's conclusion that the ties have a negative value of $1,830 based on its estimate that only fifteen percent of the ties are salvageable and that it will cost 50 cents each to remove them. While petitioner disputes the ICC's finding as to the percentage of ties that are

salvageable, the Commission did not abuse its discretion in crediting the IDOT estimate, informed as it was by that department's "knowledge of the condition of the ties from routine inspection of the line." *Id.*

Petitioner correctly points out, however, that had the line been abandoned, it would have had the benefit of the terms of its gift to the Cerro Gordo Conservation Board. These provided that while Iowa Terminal retained the right to salvage rails, ties, and other materials from the 2,000–foot right-of-way, the Board agreed to relieve the railroad of any obligation to remove them. Reply Brief for Petitioner at 15; Letter of Agreement, J.A. at 319. Therefore in its calculation of the salvage value of the ties on this right-of-way, the ICC should have included only those that could have been removed and sold at a profit. Just as the ICC was entitled to rely on petitioner's conditional gift in finding that the Mason City Division right-of-way has no value, so must it grant petitioner the benefit of having relieved itself, by virtue of the gift, of the obligation to remove the ties.

### 3. *Land at Emery*

The ICC determined that Iowa Traction should be permitted to purchase an approximately ten-acre parcel of land at Emery at a price of $2,000 an acre. Petitioner argues that only two acres of land should be included in the transaction, and that the land is worth $5,000 an acre. We uphold the ICC's decision on both counts.

Under subsection 10905(f)(1)(C), the ICC is instructed to calculate the value of "all facilities on the line or portion necessary to provide effective transportation services." Petitioner argues that only two acres of the Emery parcel are "necessary" to operate a railroad. Brief for Petitioner at 12. Indeed, petitioner notes that the remaining land has been leased for many years to a third party for nonrail purposes. *Id.*

■ In the course of denying Iowa Terminal's petition for a stay, the ICC defended the inclusion of the full parcel:

Simply because the land may not have been used in the past for rail operations does not mean that the land cannot be deemed essential for the acquiring party's future effective transportation services. [Iowa Traction] indicated in its request to set terms that it needed to purchase the entire 10–acre parcel of land ... to conduct operations and to allow for expansion of the shop when a second car storage building was necessary.

*Denial of Stay,* J.A. at 470–71 (footnotes omitted).

We accept the ICC's analysis. The purpose of the statute empowering the Commission to mandate a sale is to keep viable lines in operation. While the land has not been used for rail operations in the past, we will not challenge the ICC's expert determination that the continued availability of the land is required to assure the effective operation of the Mason City Division in the future.

■ Nor do we believe the Commission acted arbitrarily when it established a value of $2,000 an acre for the land in light of the "lack of sewers, water, or paved streets in Emery...." Although two appraisals (including one by the IDOT) valued the land at approximately $5,000 an acre, J.A. at 220, 306, the ICC found the basis for these valuations inadequately explained. *Valuation Decision,* J.A. at 388. The ICC relied instead on an appraisal by Edgington Realty that was based on sales of nearby land at between $1,500 and $2,150 an acre. J.A. at 222. While we have certain reservations about the Commission's decision, we do not find it arbitrary or capricious. The ICC weighed conflicting evidence and, in reasoned fashion, explained why it found the Edgington Realty estimate to be the most credible.

### 4. *The Emery Buildings*

■ Petitioner charges that the ICC undervalued two buildings on the land at Emery, an industrial shop and an old car barn. We agree.

The ICC determined that Iowa Traction need not purchase the old car barn because it is not necessary to the operation of the

line. Thus it placed no value on the structure. At the same time, however, the Commission concluded that the land underlying the barn was necessary to the line's operation. To resolve this apparent dilemma, the Commission treated the land and structure as severable, noted that Iowa Traction had offered to pay rent for the barn after taking title to the land, and directed the parties to negotiate its disposition. *Denial of Stay*, J.A. at 471 n. 4.

We see nothing in the language or logic of section 10905 that would require a railroad intent on abandoning a line to become an unwilling landlord, or to dispose of less than its entire interest in a "facility" deemed necessary for the line's continued operation. Buildings and the land on which they are situated are not normally sold independently of one another, and we find it arbitrary and capricious to require petitioner to do so in this instance. If the ICC is to place petitioner in the position it would have been in had it been permitted to abandon the line, the Commission on remand must determine the fair market value of the property, including the barn, to a non-rail user.

■■■ The Commission's valuation of the industrial shop is also flawed. Both companies had the shop appraised. Petitioner's appraiser placed the replacement cost of the building at $260,440. J.A. at 316. Iowa Traction's appraiser placed it at $258,300. J.A. at 219. Both agreed that the replacement cost must be depreciated to reach present fair market value; thus, Iowa Traction's appraiser depreciated his cost by forty percent to reach a present value of $155,900. *Id.*

The ICC rejected these appraisals in favor of a third estimate, also offered by Iowa Traction, which valued the building at $90,000. The ICC rejected the higher appraisals for two reasons. First, the Commission noted that they both included the value of the land underneath the shop, and asserted that it was "unable to evaluate separately the value of the building from the land." *Valuation Decision*, J.A. at 390. Second, the ICC rejected the apprais-

als because "the replacement-cost basis is not proper." *Id.*, J.A. at 391.

The ICC's decision with respect to the industrial shop is neither rational nor consistent. The Commission could easily have arrived at the value of the building from the total valuation simply by subtracting the per acre values placed on adjoining land. *See* J.A. at 220, 306. Furthermore, the Commission's reason for rejecting the higher appraisals, on the ground that "the replacement-cost basis is not proper," is inconsistent with its acceptance of the third. The $90,000 estimate accepted by the Commission was derived in the same manner. The third appraiser began by determining that it would cost $150,000 to replace the building with one "[s]pecially designed for railroad use (detriment to non-railroad purchasers)," and then depreciated that cost by forty percent. J.A. at 198.

Contrary to what the ICC suggested, the distinction between this estimate and those it rejected lies not in its methodology, but in its premise. The third appraiser evidently thought his task was to determine the value of the building for *rail* use, hence the choice of a replacement model that may well be less suitable than the existing building for non-railroad users. If so, this contradicts the mandate of section 10905, which requires that assets be appraised at market value for *nonrail* rather than railroad use. Because the ICC did not adequately explain why the third estimate is the most reliable, the valuation must be rejected.

#### 5. *Rolling Stock*

■■■ Based on estimates of useful service value provided by Iowa Traction, the Commission assigned a price of $3,500 each to petitioner's electric locomotives ("motors"), and a value of $3,000 to its single box motor line car. In reaching this conclusion, the ICC rejected several written estimates offered by petitioner that set the total liquidation value of the four motors at between $77,550 and $138,950, and of the box motor line car at between $15,200 and $24,250. J.A. at 285.

The ICC rejected petitioner's estimate for the motors because it was predicated on their spare parts and scrap values. Therefore, the Commission asserted, the estimate did not "establish[ ] the fair market value of the motors *for operational purposes.*" *Valuation Decision,* J.A. at 390 (emphasis added). Yet the operational value of the motors is irrelevant for the purposes of determining net liquidation value unless their operational value is higher than their scrap value. *Chicago & North W.,* 678 F.2d at 669 (salvage value is the "constitutional minimum"). The ICC clarified its decision in the course of rejecting Iowa Terminal's petition for a stay by explaining that petitioner's prices were "far in excess of accepted scrap values" and that Iowa Traction had therefore "met its burden" by introducing evidence of their operational value. *Denial of Stay,* J.A. at 471.

This logic is flawed in two important respects. First, the ICC points to no evidence in support of its conclusion that petitioner's valuations are "excessive." Second, even if true, simply declaring that petitioner's estimates are excessive does not mean that Iowa Traction satisfied its burden of establishing that the motors' operational value exceeds their scrap value. The Commission may accept Iowa Traction's figures only if it concludes, from record evidence, that this is the case. While Iowa Traction submitted a summary of conversations with various authorities concerning the value of the motors, J.A. at 114–19, the ICC never referred to or endorsed this evidence, or explained why this second-hand summary is more believable than the independent estimates submitted by Iowa Terminal. Because the Commission refused to consider the motors' spare parts and scrap value, it is impossible for us to say that the ICC's ultimate reliance on the operational value was justifiable.

 The Commission also failed to explain adequately its decision to price the single box motor car at $3,000. The ICC disregarded estimates submitted by petitioner placing the value of the motor car at between $15,200 and $24,250, J.A. at 285, in favor of Iowa Traction's statement that the car "is believed ... to be worth $3,000." J.A. at 119. We think the statute requires something more than a seat-of-the-pants statement by the purchaser to offset third-party appraisals offered by the seller.

### III. CONCLUSION

We direct the Commission to reconsider the value of the rights-of-way, the ties located on the right-of-way subject to the contingent gift, the industrial shop and old car barn, and the rolling stock. In all other respects, the petition is denied.

*So ordered.*