# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 00-4082

DECATUR COUNTY COMMISSIONERS, *et al.*,

*Petitioners,*

*v.*

SURFACE TRANSPORTATION BOARD, *et al.*,

*Respondents.*

On Petition for Review of an Order of
the Surface Transportation Board

ARGUED APRIL 16, 2002—DECIDED OCTOBER 15, 2002

Before CUDAHY, COFFEY and WILLIAMS, *Circuit Judges.*

CUDAHY, *Circuit Judge.* The Decatur County Commissioners, the Shelby County Commissioners and the City of Shelbyville, all Indiana entities, as well as five rail shippers, Lowe's Pellets & Grains, Inc., Premier Ag Co-op, Inc., Kolkmeier Brothers Feed, Inc., Greensburg Milling, Inc., and Kova Fertilizer, Inc. (the petitioners) seek to review an Order of the Surface Transportation Board (Board or STB), declining to penalize the Central Railroad Company of Indiana (CIND) for its twenty-month embargo of a portion of the Shelbyville Line. We affirm the decision of the Board.

**I.**

The Shelbyville Line is the last 58 miles of the Shelbyville Secondary Track. The Shelbyville Secondary Track runs from Cincinnati, Ohio, (milepost 0.0) to Shelbyville, Indiana (milepost 81.0). The Secondary Track had been approved for abandonment in 1982, but was subsequently returned to service when Consolidated Rail Corporation (Conrail), its owner, entered into an agreement with the State of Indiana and local interests to provide local and "overhead" (i.e., traffic that neither originated nor terminated on the line) non-common carrier rail service on the line. When that agreement expired, Conrail and the States of Indiana and Ohio negotiated to return the line to common carrier service. As a result of the negotiations, CIND acquired the Shelbyville Secondary Track from Conrail in 1991 and assumed common carrier obligations.

Although, when CIND acquired the line, almost all of it met Federal Railroad Administration (FRA) Class 2 standards, which permitted trains to be operated at 25 miles per hour on the line, CIND spent approximately $271,000 to restore the line to an appropriate condition for common carrier service. Over the next two years, CIND continued to maintain the segment between milepost 0.0 and milepost 22, but maintenance otherwise was deferred, and approximately 30 miles of track deteriorated to FRA Class 1 standards. FRA Class 1 standards are the minimum standards for an operating rail line and permit trains to run at 10 miles per hour. *See* 49 C.F.R. § 213.9. In October 1994, CIND applied for Federal Local Rail Freight Assistance (LRFA) funds to rehabilitate the track between milepost 22 and milepost 40 (essentially the subsequently embargoed segment) to FRA Class 2 standards. The LRFA funds were to be used to replace crossties and to perform ditching and surfacing. The grant application did not mention that any grant money would be used to remedy erosion and slippage.

CIND underwent a management change in November 1994. The new management embarked on a program to rehabilitate the entire Shelbyville Line to FRA Class 2 standards. The segment between Sunman, Indiana, at milepost 39.0, and Greensburg, Indiana, at milepost 63.0, was rehabilitated to FRA Class 2 standards in 1995. CIND's application for LRFA funds was also granted in part. As a condition of the grant, however, CIND was required to spend $30 of its own funds for each $70 of LRFA funds that it spent. CIND never used the LRFA grant funds.

CIND became aware, during an inspection trip, of slippage, erosion, slides and other problems between milepost 23.0 and milepost 39.0 after heavy spring rains in 1996. The railroad made temporary repairs to permit continued operations but held off on a permanent resolution, claiming uncertainty about the Shelbyville Line's viability. CIND ceased operating over the 16-mile segment between milepost 23.0 and milepost 39.0 on February 24, 1997, after its personnel and a consultant inspected the line and found that significant slippage had occurred at milepost 32.8.

On the same day, CIND's President, Christopher Burger, telephoned to inform the five shippers who are petitioners in this case, and later notified them by letter, that rail operations were being discontinued over the affected segment but that CIND would continue to serve them from the west. None of the shippers are located along the 16-mile segment itself. Burger advised the shippers that they would soon be notified of rate changes in connection with the new routing. He also warned them that the affected segment might not be repaired, stating, "Based upon our knowledge of existing and potential traffic, we do not believe at this time that the expense of repairing, rehabilitating and continuing to operate the line can be justified."

At the time CIND stopped operations over the affected segment, the Shelbyville Line handled primarily overhead traffic, which could be rerouted over other lines. Most of the Shelbyville Line's overhead traffic had come from Conrail. But, in 1996, the completion of a major rail infrastructure project in Cincinnati had relieved some of the congestion that had prompted Conrail to route some of its traffic over CIND. The bulk of the traffic over the Shelbyville Line, however, still consisted of this Conrail interchange traffic.

A week after CIND ceased operations on the 16-mile segment, CIND rerouted its Conrail interchange traffic from Indianapolis to Sharonville, Indiana. CIND also rerouted traffic originating or terminating on the Shelbyville Line as necessary so that all shippers could receive uninterrupted rail service using routes that did not involve the 16-mile segment. Two weeks later, on March 13, 1997, CIND announced surcharges of $700 to $1,000, effective on April 2, 1997, on all carloads moving between the Shelbyville Line and interchange points at Shelbyville, Indianapolis or Frankfort, Indiana.

In response, on April 2, 1997, the petitioners filed a complaint with the Board pursuant to 49 U.S.C. § 11701(b)[1] and asserted that CIND had unlawfully discontinued operations on a rail line in violation of 49 U.S.C. § 10903[2]

---

[1]  Section 11701(b) provides:

> A person, including a governmental authority, may file with the Board a complaint about a violation of this [statute] by a rail carrier providing transportation or subject to the jurisdiction of the Board.

[2]  Section 10903 provides in relevant part that:

> (a)(1)  A rail carrier providing transportation subject to the jurisdiction of the Board under this [statute] who intends to—
> (continued...)

and had imposed unlawful surcharges on freight in violation of 49 U.S.C. §§ 10701-04.[3] The petitioners sought restoration of service (by asking the Board to order immediate repairs of the soon-to-be embargoed segment) and requested an award of damages (for the costs associated with their shift to transportation by trucks instead of by rail).

On April 10, 1997, CIND officially placed an embargo on the 16-mile segment of the line between milepost 23.0 and milepost 39.0. On April 22, 1997, CIND filed an answer to the petitioners' complaint, denying the allegations in the complaint. Thereafter, CIND filed a Motion to Stay Proceedings, indicating its intent to submit an abandonment petition with the Board sometime in the future. By an order dated September 24, 1997, the Board decided to initiate an investigative proceeding and denied CIND's motion to stay.

In the interim, CIND had been trying to increase the traffic over the Shelbyville Line. In late 1996, a decision was made to sell Conrail's lines in part to CSX Transportation, Inc. (CSXT), and in part to Norfolk Southern Railway Company (NS). CSXT was to acquire the Conrail line from which CIND received most of its overhead traffic, but CSXT would be able to reroute that traffic over its own lines without using CIND's lines. Between October 1996

---

[2] (...continued)

        (A)  abandon any part of its railroad lines; or

        (B)  discontinue the operation of all rail transportation over any part of its railroad lines,

must file an application relating thereto with the Board. An abandonment or discontinuance may be carried out only as authorized under this chapter.

[3] Sections 10701 to 10704 provide the framework for rate changes.

and October 1997, CIND engaged in negotiations with CSXT and NS, seeking favorable restructured traffic flows and other concessions in connection with the planned acquisition of Conrail by the other railroads. Although these negotiations led to certain agreements by CSXT and NS to mitigate some of the harm of lost traffic to CIND, there was no agreement benefiting the Shelbyville Line. Thus, on January 14, 1998, CIND filed a petition for an exemption from STB regulation, pursuant to 49 U.S.C. § 10502,[4] so that CIND could abandon the entire 81-mile Shelbyville Line. The petition for exemption was denied. The Board found the record inadequate and advised that a formal application for abandonment should be filed under 49 U.S.C. § 10903 if CIND wished to pursue abandonment. CIND filed a petition to reopen the exemption proceedings on May 22, 1998, and replies in opposition were filed on June 11, 1998.

RailTex, Inc., then sought authority to acquire CIND, which was granted. In a letter filed on November 3, 1998, CIND, now a RailTex subsidiary, notified the Board that it had decided to resume operations over the entire Shelbyville Line, and it withdrew its petition to reopen the exemption proceeding. On September 28, 2000, the Board issued an order denying the petitioners' complaint. The Board found that: (1) CIND's failure to operate over the embargoed segment of the Shelbyville Line during a twenty month period was not unlawful, (2) CIND did not violate its common carrier obligations and (3) the establishment of the surcharges of $700 to $1000 did not violate 49 U.S.C. §§ 10701-04. *Decatur County Comm'rs v. Cent. R.R. Co. of Ind.*, No. 33386, at 2 (Surface Transp. Bd. Sept. 29, 2000) (*STB Decision*). Because operations on the entire Shelbyville Line had been restored in November

---

[4] Section 10502 establishes the statutory scheme for grants of exemptions.

1998, the Board did not consider, in its order denying the complaint, the petitioners' request for an order restoring service on the line. Petitioners now appeal from the Board's determination that the embargo remained reasonable during the twenty-month period.

## II.

This court has jurisdiction to review final orders of the STB pursuant to 28 U.S.C. §§ 2321(a) & 2342(5). Our review of a decision by the Board is narrow. We will affirm an order that is supported by substantial evidence. *See RLTD Ry. Corp. v. Surface Transp. Bd.*, 166 F.3d 808, 812 (6th Cir. 1999) (citing *ICC v. Louisville & Nashville R.R.*, 227 U.S. 88, 94 (1913)). We review a determination of the Board regarding an embargo under "the high level of deference accorded to an agency's reasonable interpretation of the statutes which the agency administers." *United Transp. Union-Ill. Legislative Bd. v. Surface Transp. Bd.*, 169 F.3d 474, 476 (7th Cir. 1999) (citing *Chevron, U.S.A., Inc. v. Natural Res. Defs. Council, Inc.*, 467 U.S. 837 (1984)).

## III.

The statutory common carrier obligation imposes a duty upon railroads to "provide transportation or services on reasonable request." 49 U.S.C. § 11101(a). A railroad may not refuse to provide services merely because to do so would be inconvenient or unprofitable. *G.S. Roofing Prods. Co. v. Surface Transp. Bd.*, 143 F.3d 387, 391 (8th Cir. 1998). The common carrier obligation, however, is not absolute. *Id.* A valid embargo will relieve a carrier of its obligation to provide service. *Id.* at 392. An embargo can be imposed by a carrier to temporarily cease or limit service when it is physically unable to serve specific shipper locations.

Under its common carrier obligation, the embargoing railroad must restore service within a reasonable period of time. *Id*.

To be valid, an embargo must be reasonable at all times. *G.S. Roofing*, 143 F.3d at 392. The Board employs a balancing test to determine the reasonableness of an embargo. Under this test, the Board considers: (1) the cost to repair the railroad; (2) the intent of the railroad; (3) the length of the embargo; (4) the amount of traffic on the line and (5) the financial condition of the carrier. *Id*. "The reasonableness of an embargo involves a fact-specific inquiry and is to be determined on a case-by-case basis." *Id*. Here, the Board applied the balancing test and concluded that the embargo remained reasonable at all times. The petitioners contend that the Board erroneously applied the balancing test. They argue that: (1) the Board erred in considering the cost to rehabilitate the *entire* Shelbyville Line; (2) the Board's determination of CIND's intent was not supported by substantial evidence; (3) the Board erred in determining that CIND acted reasonably in imposing an embargo for twenty months and (4) the Board erred in relying on the projected long-term profitability of the Shelbyville Line. We address these arguments in turn, in the context of the Board's balancing test.

### A.

As the first step in applying its balancing test, the Board examines the cost to repair the railroad to return it to safe operating condition. In the present case, the Board found that the cost to repair the embargoed portion of the line to FRA Class 1 standards (the minimum operating standard for a rail line) was $369,230. The Board also found that the cost to repair the non-embargoed portion of the Shelbyville Line to FRA Class 1 standards was $187,250. Thus, the Board determined that the cost to repair the entire line was $556,480.

The petitioners argue that, since the Board calculated this latter number (the $556,480 figure), the Board considered that figure, which was the cost to repair the entire line, instead of the cost to repair only the embargoed portion of the line. Using the cost to repair the entire line was erroneous, the petitioners allege, because the "proper standard for assessing the cost of repair should focus on the cost of resuming services at pre-embargo levels." *G.S. Roofing*, 143 F.3d at 393. But we believe that the Board properly examined the cost of resuming services as prescribed in *G.S. Roofing*.

In the present case, to determine the "cost of resuming services at pre-embargo level," the Board had to decide how much of the line needed repairs and how extensive those repairs needed to be. To operate at all, the line had to be restored to FRA Class 1 standards. Before the embargo, the entire Shelbyville Line operated at FRA Class 1 standards or better. And, unlike the railroad in *G.S. Roofing*, CIND had never received an exception to run its lines at standards below FRA Class 1 standards. Thus, since the embargoed segment could not be used unless the rest of the line was at least up to the lowest operating standards, the Board correctly focused on the "cost of resuming services at pre-embargo levels" when it examined the cost to repair the Shelbyville Line to FRA Class 1 standards.

The Board, however, contends that it examined the cost to repair the entire Shelbyville Line, not with respect to factor 1 of the balancing test, but in connection with its study of the financial condition of CIND (factor 5 of the balancing test). As we have indicated, however, even if the Board had considered the cost to repair the whole rail line under factor 1 of that test, the Board did not err. The reasonableness of an embargo is determined on a case-by-case basis. *G.S. Roofing*, 143 F.3d at 392. In this case, there are no shippers located within the embargoed por-

tion of the line. Hence, it was proper to take into account the cost of repairing the non-embargoed portions of the line since those parts of the line had to be used to serve the shippers. Thus, the Board did examine the cost of resuming services at pre-embargo levels because, in order to service the shippers, the whole Shelbyville Line would have to be repaired to FRA Class 1 standards. And of course, the cost to rehabilitate the entire line would also play a part in assessing the financial condition of the railroad (another factor in the balancing test).

**B.**

As the second step in its balancing test, the Board examined the intent of the carrier with respect to the abandonment. As applied here, did the railroad allow the line segment to deteriorate and remain in non-operating condition in order to hasten abandonment of the service? In the proceedings below, the petitioners argued that CIND intended to abandon the Shelbyville Line and furthered this intent by delaying needed maintenance and depressing traffic. The Board, however, found otherwise.

> We . . . find that CIND acted reasonably in not making $68,943 in erosion repairs in 1996. Prior to the slippage at milepost 32.8, CIND had adopted a policy of applying its limited resources to the profitable southeast end of its system (between milepost 23.0 and milepost 0.0) to hold down expenses. . . . CIND was in a difficult financial condition and faced dim prospects for increased traffic and revenues. We find no credible evidence that CIND was deliberately downgrading, or actively discouraging traffic on, a viable line simply to facilitate its abandonment. Similarly, the evidence fails to show that CIND should have known that the

slippage at milepost 32.8 would worsen, that the cost of repair would escalate, and that the failure to make the repair in 1996 would eventually lead to a discontinuance of CIND's operations over the affected segment.

*STB Decision* at 10-11. The Board also found that CIND did not intentionally downgrade the service and discourage traffic in the years preceding the embargo. *Id.* at 15. Finally, the Board found that CIND made diligent efforts to satisfy its common carrier obligations by making, or being prepared to make, alternative shipping arrangements. *Id.* at 20. On appeal, the petitioners argue that "the evidence in the record does not support the Board's conclusion that CIND was applying its resources to the southeast end of the system." They cite evidence indicating that CIND had taken steps to repair and maintain various other segments of the line. This evidence, however, does not contradict the Board's conclusion that CIND was focusing on the southeast portion of the Shelbyville Line. CIND did make efforts to maintain some other portions of the Shelbyville Line. CIND made these efforts to maintain some other portions of the line because it was *required* to keep the entire line at FRA Class 1 standards or better (because FRA Class 1 standards are the *minimum* operating standards for a railroad). The Board's finding on this issue is supported by the evidence that CIND deferred maintenance on about 30 miles of the Shelbyville Line and allowed those portions, some of which were at FRA Class 2 standards, to deteriorate to FRA Class 1 standards. *STB Decision* at 4. Thus, the Board's findings on CIND's intent, namely that CIND did not deliberately downgrade the line or discourage traffic on it in order to facilitate its abandonment, were amply supported by substantial evidence.

**C.**

The third factor to be considered under the balancing test is the length of the embargo. The petitioners contend that the Board's conclusion that the embargo remained reasonable throughout its twenty-month life is an unreasonable interpretation of CIND's common carrier obligation. But the Board concluded that the embargo remained reasonable throughout the twenty months because, among other things, less than three months elapsed between the date the embargo became effective and the date CIND gave notice of its intent to abandon the line. If abandonment was to be the ultimate fate of the line, the twenty-month embargo was not unjustified.

According to the petitioners, the Board's application of the rule that an "embargoing railroad must restore safe and adequate service within a reasonable period of time to any line *as to which it has not applied for abandonment authority*," *STB Decision* at 6 (emphasis added), is erroneous because the Board's conclusion would permit common carriers to embargo rail operations and then attempt to justify the embargo by filing an abandonment petition. In fact, the petitioners strongly contend that "a railroad is required to maintain operations during the *pendency* of an abandonment petition, including making repairs that it can afford, *until* the Board determines that the present or future public convenience and necessity require or permit the abandonment." Pet. Br. at 20 (emphasis in original).

As a general matter, this argument certainly has merit. A common carrier must continue to carry out its obligation during the pendency of an abandonment proceeding. The reasonableness of an embargo, however, must be analyzed on a case-by-case basis. And a common carrier may, in some instances, satisfy its common carrier obligation without making repairs to the rail line. Here, CIND

attempted to comply with its common carrier obligation during the twenty-month period.

The Board found that "CIND did not sit idle until it filed the abandonment exemption petition in January 1998, and that CIND did not plan to leave the Line segment in an embargoed status indefinitely." *STB Decision* at 20.

> Furthermore, it is clear from the record here that CIND took actions to protect shippers while the embargo was in effect. CIND rerouted all overhead traffic without apparent complaint from the affected overhead shippers. CIND also continued to operate the unembargoed portion of the Line. Most importantly, CIND made, or was prepared to make, alternative arrangements to assure uninterrupted rail service for originating/terminating traffic, albeit at a higher rate. At no time was rail service unavailable to the affected shippers.

*Id.* at 20-21. On this record, the Board did not permit CIND to use the embargo as a tactic to avoid CIND's common carrier obligation. Rather, CIND was complying with its common carrier duties by making, or being prepared to make, alternative transportation arrangements for its customers.[5] Thus, although CIND did not resume

---

[5] The petitioners do not appeal from the Board's determination that the shipping surcharges imposed by CIND were not unreasonable. In response to the Board's argument that the shippers had alternate routings available, the petitioners argue that the Board failed to consider the additional costs incurred by the shippers in using the alternate shipping routes. But by not appealing the determination that the surcharges were reasonable, petitioners have waived any argument that the higher costs of alternate shipping routes made the embargo unreasonable. It may well have been the case that, if CIND had repaired the

(continued...)

operations by making repairs on the embargoed portion of the line during this twenty-month period, CIND did make arrangements that would mitigate any harm arising from its failure to resume rail operations. Therefore, the Board did not err in concluding that the embargo remained reasonable during the twenty-month period.

We do not endorse any general rule that a common carrier may always discharge its obligation by making alternative arrangements, but here the financial condition of the railroad and its prospects made the substitution reasonable.

**D.**

Finally, the petitioners argue that the Board further erred when it did not consider whether CIND presently had the financial ability to repair the non-embargoed portion of the line, but instead considered the long-term profitability of CIND under factors 4 and 5 of its balancing test. The petitioners argue that the Board should have made a specific finding on CIND's present ability to make the repairs. *See G.S. Roofing*, 143 F.3d at 392 ("The cost of repairing a line to safe operating condition, and the carrier's ability to physically and financially carry out such repairs, are keys to the continuing reasonableness of an embargo."). The petitioners also contend that the record indicates that CIND was financially capable of paying for repairs. Finally, the petitioners allege that considering the long-term profitability of CIND was erroneous because "notions of long-term feasibility have

---

[5] (...continued)
embargoed portion of the line and resumed operations, CIND may have been able to impose shipping rates comparable to the increased surcharges (of course, after following appropriate rate changing procedures).

no place in a proceeding to determine the reasonableness of an embargo." *Id.* at 393-94. We reject all of these contentions.

First, the Board was not required to make a specific finding that CIND had funds on hand to carry out repairs on the line and, in fact, the requirement for such a finding is not included among the stated factors of the balancing test. Second, the Eighth Circuit's statement that "the carrier's ability to physically and financially carry out such repairs, are keys to the reasonableness of an embargo," *G.S. Roofing*, 143 F.3d at 392, does not necessarily dictate a specific finding on the carrier's *present* ability to physically and financially carry out repairs. The Eighth Circuit's statement does not even require the Board to make such a specific finding. Still, while the financial ability to carry out repairs is not a formal factor in the test, it obviously plays a part in the analysis. For example, if a carrier could financially undertake repairs but instead maintains the embargo for a long period of time, it may be reasonable to conclude that the carrier is not acting in good faith—which goes to the question of a carrier's intent, the second factor in the balancing test. Thus, the Board is not required to make a specific finding on whether CIND presently could financially carry out the needed repairs on the line.

Here, the Board considered a somewhat different question—whether it made business sense for CIND to invest in the necessary repairs under the conditions that prevailed. The Board considered this question under the fourth and fifth steps of its balancing test, the volume and type of traffic over the embargoed line and CIND's financial condition. In connection with factor 4, the Board found that "[p]rojected revenues from [foreseeable] traffic would be significantly less than what would be needed to cover operating expenses and provide a return on investment (ROI), *let alone to cover the needed repairs and*

*rehabilitation.*" *STB Decision* at 15 (emphasis added). Similarly, in connection with its analysis of factor 5, the Board concluded that "CIND's decision not to [repair the embargoed line in 1996], however, was a reasonable business decision given the fact that the Line's projected revenues under any realistic scenario *were not sufficient to cover operating expenses* and provide a return on investment." *Id.* at 18 (emphasis added).

The petitioners disagree with the Board's interpretation of the evidence. They argue that the record indicates that CIND was profitable in 1996 and, in the beginning of 1997, had received an LRFA grant of $172,521 for repair of the Shelbyville Line and had cash on hand of approximately $1.1 million. Thus, petitioners argue that CIND could afford to spend the $369,230 required to repair the embargoed portion of the Shelbyville Line (and this argument could be extended to accommodate the $556,480 figure to repair the entire line).[6] But the Board found that CIND's positive financial result in 1996 depended on the proceeds of a non-recurring sale of real estate, most of which were used to pay off CIND's outstanding debt. *STB Decision* at 17. Were it not for the sale of the real estate, CIND would have had the second worst pre-tax net loss in its history of operating the Shelbyville Line. *Id.* Further, CIND's positive working capital position realized in 1997 was the direct result of a decrease in operating expenses attributable to paying off CIND's debt with the proceeds from the real estate sale. *Id.* Thus,

---

[6] The petitioners also argue that the Board did not include revenue from Conrail interchange traffic in its projection of future revenues. However, the Board did in fact consider the revenue from Conrail interchange traffic. It found that "Conrail traffic, which averaged 77% of CIND's overhead traffic in 1994, 1995, and 1996, has been lost and will not be rerouted back." *STB Decision* at 15.

although the Board "recognize[d] that CIND could have repaired the Line and rehabilitated it up to FRA Class 1 or FRA Class 2 standards in 1996 with the use of borrowed funds, LRFA grant funds, or some of the proceeds from the real estate sale," the Board concluded that CIND's decision not to do so was reasonable in light of its past operating history, its present inability to build traffic over the Shelbyville Line and its poor future prospects. *Id.* at 18. The Board's analysis is eminently reasonable and thus, under our deferential standard of review, may be approved.

The petitioners, however, argue that the Board's consideration of past financial difficulties and projected future profitability are legally erroneous. They argue that the Board could only consider CIND's present financial capability to make repairs. They emphasize that an embargo is a temporary, emergency condition. Finally, the petitioners cite to the quoted language of *G.S. Roofing* that a carrier's ability to physically and financially carry out such repairs is the key to the continuing reasonableness of an embargo and that "notions of long-term feasibility have no place in a proceeding to determine the reasonableness of an embargo." *G.S. Roofing*, 143 F.3d at 393-94. Limiting the Board only to considerations of present financial capability, however, would not be a sensible policy. In calculating the appropriate demands to place on shortline carriers like CIND, the Board must consider many things, including the attractiveness to operators of the opportunity to take over lines like the Shelbyville Line. This case is a perfect example of the need to allow the Board the flexibility to examine both past and projected financial circumstances to arrive at fiscally reasonable solutions.

First, the factual circumstances of this case sharply distinguish it from *G.S. Roofing*. As *G.S. Roofing* acknowledges, an embargo may remain valid if service cannot be resumed at a safe level without substantial expendi-

tures. *G.S. Roofing*, 143 F.3d at 394 ("If service can be resumed at safe levels without substantial expenditures of time or money, a railroad should not be permitted to refuse to resume service merely because extensive improvements might be necessary for the long-term success of the line."). In *G.S. Roofing*, the railroad "could have made minor interim repairs that would have allowed the line to operate as it had." *Id.* The actual cost to repair the line in *G.S. Roofing* was $10,000 and the time required was four hours. *Id.* at 393. Here, the Board found that CIND could not resume service at FRA Class 1 standards without a substantial expenditure of money. And the Board is clearly correct that $369,230 (or $556,480) is a substantial expenditure of money. *G.S. Roofing* is a different case.

Further, CIND's financial capability to make repairs was viewed reasonably (at the moment CIND imposed the embargo and during the embargo period) as a temporary situation in light of CIND's past financial difficulties and future prospects. Not allowing the Board to consider the *context* of the railroad's present financial condition in light of past and projected future financial conditions would hamper the Board in deciding whether an embargo was reasonable. It makes no economic sense *always* to compel a common carrier to make repairs based upon its realizing a financial windfall. This is particularly true where the common carrier had made, or was prepared to make, alternative arrangements to satisfy its common carrier obligations.

In *G.S. Roofing*, past financial condition was not an issue and therefore the case certainly does not prohibit an examination of that circumstance. We also do not read *G.S. Roofing* to prohibit the Board's consideration of future projected revenues in order to put CIND's present financial capability into context, as was done here. Besides not specifying whether it is a carrier's *present* "abil-

ity to physically and financially carry out such repairs [that is key] to the reasonableness of an embargo," *G.S. Roofing*, 143 F.3d at 392, the Eighth Circuit did not limit the factors the Board could consider in determining the common carrier's ability to carry out repairs. We believe that future projected revenues may be considered in determining a common carrier's capability to carry out repairs. Further, while we agree with the Eighth Circuit that an embargo may not be justified "solely on the grounds that to continue to provide service would be inconvenient or less profitable," *id.* at 394 (quoting *Ethan Allen, Inc. v. Me. Cent. R.R.*, 431 F. Supp. 740, 743 (D. Vt. 1977) (internal quotations omitted)), the embargo in the present case was justified based upon other considerations as well—such as CIND's good faith in making alternative shipping arrangements. Thus, the Board did not err in applying its balancing test to determine that the embargo was reasonable.

## IV.

For the foregoing reasons, the petition for review of the determination of the Board is DENIED.

A true Copy:

       Teste:

               _____
               *Clerk of the United States Court of*
               *Appeals for the Seventh Circuit*