In the

# United States Court of Appeals
### For the Seventh Circuit

————————

No. 05-1920

TOLEDO, PEORIA & WESTERN
RAILWAY,

*Petitioner*,

*v.*

SURFACE TRANSPORTATION BOARD
and UNITED STATES OF AMERICA,

*Respondents*,

and,

KEOKUK JUNCTION RAILWAY
COMPANY,

*Intervenor-Respondent*.

————————

Petition for Review of an Order of the
Surface Transportation Board
No. 34335

————————

ARGUED JANUARY 13, 2006—DECIDED SEPTEMBER 7, 2006

————————


Before RIPPLE, KANNE and ROVNER, *Circuit Judges*.

RIPPLE, *Circuit Judge*.  On April 9, 2003, Keokuk Junction
Railway Company ("KJRY") filed with the Surface Trans-

portation Board (the "STB")[1] a "feeder line" application under the Staggers Rail Act of 1980, 49 U.S.C. § 10907.[2] By this application, KJRY sought a court order mandating the sale of a rail line owned by Toledo, Peoria & Western Railway ("TP&W"). After extensive litigation on the subject, the STB granted this application, having found that KJRY had met the statutory requirements; it set the line's net liquidation value, which is composed of the salvage value of the line's track and other materials plus the value of land owned in fee by TP&W, at $3,940,756. TP&W subsequently filed a petition for reconsideration, which the STB granted in part and denied in part. Specifically, the STB found error in its previous valuation analysis and revised the value of the line upward to $4,165,742.

TP&W subsequently filed a petition in this court seeking review of the order of the STB; it contends that the STB

---

[1] Congress abolished the Interstate Commerce Commission in 1995 and created in its place the STB. *See* 49 U.S.C. § 702 ("Except as otherwise provided in the ICC Termination Act of 1995, or the amendments made thereby, the [Surface Transportation] Board shall perform all functions that, immediately before January 1, 1996, were functions of the Interstate Commerce Commission[.]"). The STB is an independent agency administratively affiliated with the Department of Transportation; it has an exclusively rail-oriented set of responsibilities.

[2] Title 49 U.S.C. § 10907 requires the STB to order the sale of a rail line when it has been abandoned or not adequately served by its owner if the buyer is found to be "financially responsible" and various other statutory requirements are met. 49 U.S.C. § 10907(b)(1). Under § 10907(b)(2), the seller is entitled to the "constitutional minimum value" of the rail line, which the statute defines as "not less than the net liquidation value of such line or the going concern value of such line, whichever is greater." *Id.* § 10907(b)(2).

erroneously calculated the constitutional minimum value of the line. According to TP&W, the STB should have valued the track and other materials using current market prices of steel rather than a 14-month average. In addition, TP&W submits that the STB should have considered rebuttal evidence from TP&W, which called into question the validity of the land-title analysis performed by KJRY's experts. Further, according to TP&W, the STB should have compensated TP&W for the value of tax credits for which it would be eligible over the next three years under the American Jobs Creation Act of 2004, 26 U.S.C. § 45G. For the reasons set forth in the following opinion, we deny TP&W's petition for review.

# I

# BACKGROUND

## A. Facts

For a number of years, TP&W has operated a 76-mile rail line in West Central Illinois, which runs from its junction with KJRY near La Harpe, Illinois, to its junction with Union Pacific Railroad Company at Hollis, Illinois ("La Harpe-Hollis Line" or "line"). In December 2000, TP&W sold its right to operate this line and the majority of its rail materials to SF&L Railway, Inc. ("SF&L") for approximately $2.18 million. The sale was challenged and, finding that SF&L's purpose was to abandon and salvage the line, the STB revoked SF&L's authority to acquire the line and directed that TP&W retake possession. *See SF&L Railway, Inc.—Acquisition & Operation Exemption—Toledo, Peoria & W. Railway Corp. Between La Harpe & Peoria, Illinois,* STB Finance Docket No. 33996 (Oct. 15, 2002).

Subsequently, on April 9, 2003, KJRY filed a "feeder line" application under 49 U.S.C. § 10907 seeking the forced sale of the line. KJRY claimed in its application that TP&W "clearly and persistently refused to make the necessary efforts to provide adequate service to shippers who transport traffic on the Line," A.R. 207572 at 22, and that KJRY's purchase of the line would improve significantly service on the line, *see id.* at 26-27. It offered to purchase the line with or without the Mapleton Spur, a 2.5-mile connecting segment of the line at Milepost 123 that runs through an industrial park. The application calculated the constitutional minimum value of the line according to its net liquidation value ("NLV"), which is defined by its net salvage value ("NSV") plus its land value. *See* 49 U.S.C. § 10907(b)(2). KJRY estimated the NLV of the line to be $3,393,363, a sum comprised of $3,283,504 for TP&W's track and other materials and $109,859 for its real estate. With regard to salvage value, KJRY relied on the description of TP&W's assets prepared by TP&W in a previous effort to sell the western segment of the line, applied current market prices and subtracted the estimated cost of removal. With regard to land valuation, KJRY noted in its application that it lacked information about TP&W's real estate holdings necessary to perform an accurate land valuation. According to KJRY, it had filed discovery requests for copies of TP&W's deeds, valuation maps and real estate records; TP&W refused these requests, contending that the documents were publicly available. In the absence of this information, KJRY estimated the value of TP&W's land at $100,000, premised on the assumption that TP&W held marketable title to 50% of the right-of-way—a total of 864 acres—and that its parent company, RailAmerica, owned in fee the remainder of the

land.[3]

KJRY's April 2003 application was found to be deficient by the STB. *See Keokuk Junction Railway Co.—Feeder Line Acquisition—Line of Toledo, Peoria & W. Railway Corp. Between La Harpe & Hollis, Ill.,* STB Docket 34335, 2003 WL 21043073 (May 9, 2003). In pertinent part, the STB rejected KJRY's claim that the line did not have a going concern value ("GCV"); it found that, because the Mapleton Spur has the ability to continue to earn profit, requiring the sale of this portion of the line to KJRY mandated compensation for income earned from its operation. *Id.* at *3 (holding that KJRY's offer to accord TP&W trackage rights over the Spur "is neither the equivalent of, nor a reasonable substitute for, an actual GCV estimate").[4] The STB offered KJRY an opportunity to perform a GCV estimate and file it with the STB along with supporting data. Accordingly, KJRY amended its application on June 9, 2003; it calculated the

---

[3] KJRY did not calculate in its April 2003 application the going concern value ("GCV") of the line. It submitted that the only portion of the line profitable to TP&W was the Mapleton Spur, and that, because KJRY had offered "TP&W the opportunity to retain the economic benefit of operating the Mapleton Segment" by "according TP&W trackage rights" over that portion of line, TP&W would continue to earn profit from the Spur and therefore should not be compensated for any economic benefit derived from its current operation. A.R. 207572 at 16.

[4] The STB also requested from KJRY "additional evidence of financial responsibility to purchase and operate the entire line, and more detailed operating plans and *pro forma* financial statements." *Keokuk Junction Railway Co.—Feeder Line Acquisition—Line of Toledo, Peoria & W. Railway Corp. Between La Harpe & Hollis, Ill.,* STB Docket 34335, 2003 WL 21043073, at *4 (May 9, 2003). The KJRY amended its application to include these materials on June 9, 2003. *See* A.R. 208011 at 21-23.

GCV of the line, assuming exclusive service over the Spur by KJRY, to be $3,461,434. To arrive at this sum, KJRY used TP&W's operating data from 1998—the most recent data available to KJRY—which showed that TP&W earned appropriately $1,412,830 in shipments moving to and from the Mapleton Spur. KJRY subtracted from this number estimated operating expenses of $1,059,623, yielding an annual income from the Spur of $353,208. This in turn produced a GCV of $3,461,434. *See* A.R. 208011.

Alternatively, KJRY proposed the following: "KJRY will purchase all of the Line, except the Mapleton Spur, and then allow TP&W to retain sole access at the Mapleton Spur. . . . KJRY will grant TP&W access over the Line between Hollis and the Mapleton Spur at no trackage rights charge[.]" *Id.* at 20. Under this scenario, according to KJRY, TP&W would be entitled to the NLV of the line not including the Spur, which it calculated as $3,284,605 (the Spur is the only portion of the line with a GCV).[5]

TP&W filed its response to KJRY's application on October 16, 2003. In pertinent part, TP&W challenged KJRY's calculations of the line's constitutional minimum value. TP&W urged the STB to treat the eastern and western portions of the line as "two easily severable properties," "apply[ing] the NLV to the Western End and the GCV to the Eastern End, which includes the Mapleton Spur." A.R. 209135 at 39. Under this approach, according to TP&W, the line should be valued at $6,854,797. In the alterative, assuming that it would be compensated only for its liquid assets—track, materials and real estate—TP&W sub-

---

[5] On July 9, 2003, the STB accepted KJRY's application for filing, subject to compliance with environmental reporting requirements.

mitted that KJRY erred in calculating the salvage value of the track and materials because it relied upon "five-year old track charts." *Id.* at 41. TP&W's expert, Mark Garvin, instead based his analysis on recent records of TP&W's assets, dividing the materials into three categories: relay steel; reroll steel; and scrap. *Id.*, Ex.E. He then compared the quantities of each with current market prices and subtracted removal costs. He calculated the western portion of the line's NSV to be $4,410,920. According to TP&W, KJRY also erred in valuing TP&W's real estate. TP&W presented the real estate analysis of Todd Cecil, its Vice President of Real Estate, who estimated that TP&W owned 672 acres of land. *Id.*, Ex.F. Cecil valued this land as an "assembled corridor," assuming that the property would be purchased for use as a rail line: He divided the land into parcels for the purpose of comparing them to the price of sale for similarly-sized properties in the area, and then added an "[e]nhancement [f]actor" to reflect the value of the land as a "ready-made, assembled corridor" to the purchaser. *Id.* at 113. In all, Cecil estimated that TP&W's real estate was worth $7,009,497. This produced an NLV of $9,218,759.

KJRY filed a reply to TP&W's response on November 7, 2003, in which it withdrew its offer to purchase the Mapleton Spur. *See* A.R. 209359 at 5 ("KJRY remains willing to purchase just the line, from Hollis to La[]Harpe, without the Mapleton Spur, and to grant TP&W access from Hollis . . . to the point of connection with the Mapleton Spur without a trackage rights charge so that TP&W could continue to serve the shippers on the Mapleton Spur."). With its reply, KJRY also included the real estate analysis of Brian D.

Mooty.[6] Mooty analyzed approximately 200 deeds to determine the "type of ownership interest conveyed based on the language contained in each of the deeds." *See id.,* Ex.10 at 1. He concluded, on the basis of this language, that TP&W owned 31.657 acres in fee[7] and that the remainder of the deeds did not convey to TP&W marketable title but rather only an easement over the land. *See also id.,* Ex.10 at 3 (noting, for example, that some of the deeds contained the qualifying language, "occupied and used by the Railway," and that TP&W's interest in this type of land ceases when the "easement ownership interest ceases" (internal quotation marks omitted)); *see also id.,* Ex.10-A.

KJRY also presented with its reply the valuation analysis of independent Illinois-certified real estate appraiser L. Arlen Higgs. *See id.,* Ex.11. Higgs estimated that the 28.24 acres of land allegedly owned in fee by TP&W were worth a total of $37,140. According to KJRY, TP&W's expert, improperly valued the land as a "corridor, rather than as individual parcels," contrary to STB precedent; this added "20% to 40% to the value of the right of way on the supposition that the property has value as a rail corridor." A.R.

---

[6] KJRY noted in its reply that, prior to the filing of TP&W's response, it had no access to relevant documents, including TP&W's deeds; only after receiving copies of these documents, which were attached to Cecil's real estate analysis, could it hire an attorney to analyze their language and to provide a comprehensive assessment of TP&W's real estate interests.

[7] KJRY took issue with a portion of Mooty's analysis. Specifically, on the basis of a second real estate appraisal authored by its general counsel, KJRY urged the STB to find that TP&W owned only 28.24 acres of marketable property, instead of the 31.657 acres proposed by Mooty. The STB rejected this suggestion.

209359 at 45. By contrast, Higgs compared the land to the sale of "abandoned rail right[s] of way" in Illinois, the type of property he claimed to be most similar to TP&W's rail line. *Id.* at 52-53 (noting that this type of land typically is sold at a "51% to 84% discount from the value of adjacent property . . . [because of] the size, shape and limited number of potential buyers"). Averaging the price of sale of six comparable properties over a fifteen-year period, Higgs projected a value of $1,568 per acre.[8] In all, KJRY proposed that the "line (without the Mapleton Spur) has a NLV of $3,321,745." *Id.*, Ex.11 at 9.

TP&W filed no counter-response to KJRY's reply, although it supplemented the record in March 2004, and again in November 2004, with evidence that market prices of steel had increased, thus increasing the line's net salvage value.

## B. STB Proceedings

### 1. October 2004 Decision

The STB granted KJRY's feeder line application on October 28, 2004. It found that KJRY had demonstrated that

---

[8] KJRY also challenged in its reply brief the valuation of track and other rail materials performed by TP&W's expert. "By using costs at which it purchases materials for comparison, rather than costs at which materials are sold," KJRY submitted, "Mr. Garvin gives his valuation a 15% to 30% boost. Ordinarily, purchasers of rail materials must allow a 15% to 30% margin to cover expenses such as materials handling, inventory carrying, and profit." A.R. 209359 at 41 (also noting that Garvin improperly treated grade crossing facilities and bridges as salvageable material and understated the cost of removal). Instead, KJRY urged the STB to value the track and materials at "wholesale" prices. *Id.*, Ex.8 at 2.

sale was proper under 49 U.S.C. § 10907(c)(1). Section 10907(c)(1) sets forth five conditions that must be fulfilled for forced sale of a rail line to be appropriate:

> (A) [That] the rail carrier operating such line refuses within a reasonable time to make the necessary efforts to provide adequate service to shippers who transport traffic over such line;

> (B) [That] the transportation over such line is inadequate for the majority of shippers who transport traffic over such line;

> (C) [That] the sale of such line will not have a significantly adverse financial effect on the rail carrier operating such line;

> (D) [That] the sale of such line will not have an adverse effect on the overall operational performance of the rail carrier operating such line; and

> (E) [That] the sale of such line will be likely to result in improved railroad transportation for shippers that transport traffic over such line.

49 U.S.C. § 10907(c)(1).

The STB found that "KJRY ha[d] satisfied each of the five statutory criteria." Petitioner's App., Ex. A at 10. Specifically, it determined that TP&W had refused to provide adequate service over the line "since February 10, 2003, when it reacquired the La Harpe Line pursuant to [the STB's] order." *Id.* at 4. Contrary to TP&W's claim that it was ready and able to provide such service but had not received service requests, the STB found that TP&W had "actively discouraged use of the [l]ine" by, among other things, refusing to provide rate quotes to shippers who wanted to move over the line and setting shipping rates prohibitively

high. *Id.* at 5 (summarizing the experiences of shippers seeking to move over TP&W's line); *see also* 49 U.S.C. § 10907(c)(1)(A). The STB next found that, as a result of these practices, transportation over the line was "inadequate" and that its sale would improve "rail transportation for shippers." Petitioner's App., Ex.A at 7, 9-10; *see also* 49 U.S.C. § 10907(c)(1)(B), (E). It rejected the claim that forced sale would have a negative material effect on TP&W's finances or its operations. *See* Petitioner's App., Ex.A at 7-8 (noting that TP&W would continue to operate the only profitable portion of the line—the Mapleton Spur—and that TP&W had not provided service over the line for so long that it was unreasonable to suggest that the "[l]ine's sale could have a significant adverse operational effect on TP&W"); *see also* 49 U.S.C. § 10907(c)(1)(C)-(D). Lastly, the STB found that KJRY was "financially responsible" and could cover line expenses for at least three years. Petitioner's App., Ex.A at 20-23; *see also* 49 U.S.C. § 10907(c)(1)(D).[9]

The STB then calculated the constitutional minimum value of the rail line. *See* 49 U.S.C. § 10907(b)(2) (defining constitutional minimum value as "not less than the net liquidation value of such line or the going concern value of such line, whichever is greater"). KJRY and TP&W agreed that the line's constitutional minimum value should be defined by its net liquidation value, or NLV. Because TP&W would retain ownership of the Mapleton Spur and because KJRY had agreed to provide TP&W with cost-free trackage rights over portions of the line, the part of the line being acquired by KJRY did not have a GCV.

---

[9] The STB's findings on these matters have not been challenged by TP&W on appeal.

The STB determined that the NLV of the line was $3,940,756. As mentioned previously, NLV is comprised of two calculations: the net salvage value of the rail, ties and other track materials; and the value of the land. The STB began with salvage value, which consists of the total value of the materials minus the cost of removal. The STB accepted in large part TP&W's calculations, which utilized "current track charts, recent price quotes, and a physical inspection of the [l]ine"; it contrasted these calculations with KJRY's valuation, which was "based on older data, averages, and estimates." Petitioner's App., Ex.A at 14. According to the STB, the western segment of TP&W's rail line contains 77.46 miles of rail and the eastern segment contains 4.5 miles of rail.

The STB, however, rejected both parties' valuation of this material. In their initial applications, the parties differed widely in their estimates of the current price of relay, reroll and scrap metals. Further, after the record had closed, both parties attempted to submit revised valuations: TP&W asserted that the price of steel had increased significantly since October 2003; KJRY responded that prices had dropped. The STB concluded that the parties' divergent positions demonstrated the "recent volatility in the scrap iron and steel and reroll markets." *Id.* at 14. In light of "the time that ha[d] elapsed since this case was filed," the STB held, "it would not be appropriate to select a single date for the purpose of pegging a price for these commodities." *Id.* Instead, citing a number of cases in which it had averaged prices over multiple months in the course of valuing a rail line, the STB "average[d] the price of scrap over the time period involved," beginning in April 2003, the date that KJRY's feeder line application first was filed, and conclud-

ing in July 2004, the last month of available data.[10] The STB accepted TP&W's estimate of removal costs and set the total NSV at $3,899,121.

The STB then turned to land value. It adopted the recommendations of KJRY on the question of acreage owned by TP&W. Mooty, according to the Board, is well-qualified in Illinois real estate law; Cecil, by comparison, is not even an Illinois attorney. Further, while Cecil merely estimated that TP&W owned approximately half of the land and that its parent company, RailAmerica, owned the other half, Mooty carefully examined the language of over 200 deeds in the course of concluding that TP&W owned only 31.657 acres in fee and that the remainder of the deeds merely granted TP&W an easement over the land. The STB concurred with Mooty that the "cited language in those deeds" compelled the finding that TP&W owned 31.657 acres of land. *Id.* at 20.

The STB valued this land using KJRY's estimates as well. It held that Cecil's continuous-corridor analysis 1) improperly sought "to combine into an NLV analysis both the NLV and GCV methodologies," 2) was contrary to "the statutory distinction between the two methodologies," and 3) was inconsistent with "court precedent." *Id.* at 18 (also finding that the continuous corridor approach unfairly "inflat[ed] the value of [the] properties"). The STB instead adopted Higgs' valuation analysis, finding "more appropriate" his comparison to "six sales of abandoned rail rights-of-way in Illinois over the past 15 years." *Id.* at 20. The STB valued the

---

[10] The STB did the same for the price of reroll steel, but it based its calculations on the unit values submitted by TP&W in its original valuation charts. It provided TP&W with 30 days to supplement the record with monthly composite average unit prices of reroll.

31.657 acres owned in fee by TP&W at $41,635, resulting in a NLV of $3,940,756. The parties were given 90 days to close the sale of the rail line.

## 2. February 2005 Decision

On November 29, 2004, TP&W filed a petition to reconsider the STB's prior decision.[11] In pertinent part, TP&W contended that: (1) the STB erred in accepting and relying on Mooty's real estate analysis because it was not timely submitted in KJRY's opening brief, therefore depriving TP&W of "an opportunity to reply to that evidence," A.R. 212639 at 13; (2) the STB erred in preferring Higgs' land valuation analysis over Cecil's estimates; (3) the STB "failed to follow its own precedent" in averaging the price of steel rather than valuing the steel at its market price as of November 1, 2004, *id.* at 17; and (4) new legislation, the American Jobs Creation Act of 2004, 26 U.S.C. § 45G, entitled TP&W to compensation for certain tax credits.[12] TP&W's

---

[11] On this same date, TP&W filed supplemental data on monthly composite average steel prices, as requested by the STB.

[12] TP&W also submitted that, since October 2004, "a new shipper on the Canton to Hollis line" had emerged, "generat[ing] a going concern value" for that portion of the line. A.R. 212639 at 10; *see also id.* at 11 (urging that this "new traffic is now part of the value of the Canton-Hollis line"). The STB found that TP&W's allegations were unsupported by the record: The shipper had filed with the STB a verified statement that contradicted TP&W's version of events. Specifically, the STB noted that various issues remained unresolved between the shipper and TP&W, "making any potential agreement speculative." Petitioner's App., Ex.B at 11. The STB therefore reaffirmed its prior conclusion that the

(continued...)

petition for reconsideration was accompanied by a new real estate analysis, which was authored by Jeffrey Gray and Scott Borstein of Wildman, Harrold, Allen & Dixon, LLP. Gray and Borstein, TP&W claimed, critiqued Mooty's methodology and conclusions and therefore their analysis would help the STB in "fulfill[ing] its mandate of determining the NLV of the [l]ine." A.R. 212639 at 14. KJRY subsequently filed a motion to strike this evidence, contending that Gray and Borstein had not relied on " 'new' evidence that was unavailable at the time that TP&W filed its Comments on October 16, 2003." A.R. 212694 at 4.

TP&W's motion for reconsideration was granted in part and denied in part in a decision dated February 7, 2005. In pertinent part, the STB granted KJRY's motion to strike Gray and Borstein's land title analysis because it did not rely upon "newly available evidence" but instead was "based entirely on evidence that was available at the time TP&W filed its Comments":

> TP&W seeks to rely upon an entirely new valuation, submitted for the first time in its petition for reconsideration. TP&W's attempt to submit an entirely new land title analysis that would relitigate its ownership of the underlying real estate is inappropriate here, as TP&W could have submitted this evidence much earlier.

Petitioner's App., Ex.B at 5.

The STB took note of TP&W's argument that the "burden of proof is on the applicant to establish, in its case-in-chief,

---

(...continued)

Canton-Hollis segment of the line had no going concern value. This conclusion has not been challenged on appeal.

the value of the rail line, including its real estate," and that KJRY's land valuation was not presented until rebuttal. *Id.* at 4. The STB found, however, that TP&W was not deprived of an opportunity to respond to Mooty's valuation of the land: It "would have permitted TP&W to respond [by way of a reply to the reply]." *Id.* at 5. Further, the STB held, TP&W's objection to the admission of Mooty's real estate analysis was not preserved adequately. TP&W, the STB explained, "waited more than a year" to address Mooty's analysis, even though it could have petitioned the STB to file a reply to the reply or to supplement the record with a new land valuation before a final decision was issued. *Id.* Accordingly, the STB granted KJRY's motion to strike Gray and Borstein's valuation and the accompanying verified statements, as well as the portions of TP&W's legal argument relating to those documents.

Turning to TP&W's contention that use of a monthly composite average to calculate net salvage value was inappropriate, the STB held that when litigation is lengthy, as here, "[c]ommodity prices are . . . likely to fluctuate widely." *Id.* at 12. "It is appropriate when such fluctuations occur," the STB concluded, "to average commodity prices over the length of the proceeding to protect sellers from dramatic price reductions and buyers from dramatic price increases." *Id.*

Nevertheless, the STB adjusted the purchase price upward, finding the price of reroll steel to be higher than previously calculated. In its October 2004 decision, the STB had afforded TP&W an opportunity to supplement the record with monthly composite data on unit prices of reroll steel; TP&W availed itself of this opportunity. The

STB found this evidence to be unreliable[13] and instead chose to rely upon data submitted by KJRY. According to this data, reroll steel was worth $175.04 per ton, increasing the line's NSV by $127,828 and yielding a total NSV of $4,026,948.

In addition, the STB found that it erred in preferring Higgs' appraisal methodology over the methodology employed by Cecil in valuing the land owned by TP&W. The STB agreed with TP&W that Higgs' comparison of the rail line to six abandoned properties sold over fifteen years was not sufficiently representative: six properties was too few, fifteen years was too long, and the parcels were too far from TP&W's property to reflect adequately the value of TP&W's line. By contrast, the STB found Cecil's appraisal to be "more consistent with precedent and more credible than KJRY's analysis." *Id.* at 12. It therefore recalculated the value of the 31.657 acres owned in fee by TP&W[14] using Cecil's per-acre valuation of $4,384.29.[15] This per-acre price resulted in a total land value of $138,794 and a NLV of $4,165,742.

_____

[13] Specifically, according to the STB, the evidence submitted by TP&W covered "only the last 2 months of the 14-month period requested, and the data for one of those months (April 2004) are incorrect." Petitioner's App., Ex.B at 12. The STB further noted that TP&W's data was not "structured as a composite monthly average." *Id.*

[14] As already discussed, although accepting Cecil's per-acreage valuation, the STB did not accept Cecil's analysis of the land owned in fee by TP&W. Cecil had suggested that TP&W owned 672 acres; the STB instead found that TP&W owned only 31.657 acres in fee. *See supra* at 7, 13.

[15] Cecil originally valued the land using a 3-year sell-off period for 95% of the land. The STB slightly adjusted Cecil's valuation to reflect a 4-year sell-off period for all of the land.

The STB last considered TP&W's contention that it was entitled to compensation for tax credits under the American Jobs Creation Act, 26 U.S.C. § 45G, for planned future investment in maintaining the rail line. TP&W claimed that it planned to make $1,981,000 in qualified investments yearly, and, with regard to the La Harpe-Hollis line, would be eligible for a tax credit of $291,550 in 2005, 2006 and 2007, totaling $874,650 for the three-year period. The STB, however, held that the NLV of a rail line—the methodology that the parties had agreed should be used to value TP&W's line—includes only "physical assets of a line," excluding non-physical benefits of ownership such as tax credits. Petitioner's App., Ex.B at 13 (noting that tax credits do not "add value to assets that are being liquidated"). "[T]ax credits more likely would be a consideration in calculating GCV." *Id.* Even if this were not the case, the STB continued, TP&W had failed to demonstrate that it would qualify for the tax credits under 26 U.S.C. § 45G. To receive maximum credit under the statute, to which TP&W claimed it was entitled, TP&W would have to invest $7,000 per mile on a system-wide basis, totaling $1,749,300 in qualified investments over the course of three years. Given that TP&W already had permitted the line to fall into disrepair, the STB concluded that it was "speculative at best . . . whether TP&W would actually spend the funds necessary." *Id*.

TP&W timely filed a petition for judicial review of the STB's decision, naming the United States and the STB as defendants. *See* 28 U.S.C. §§ 2321(a) & 2342(5). On April 27, 2005, KJRY motioned to intervene as of right; the motion was granted by this court on May 2, 2005.

## II

## DISCUSSION

TP&W challenges the STB's decision on three grounds. First, it contests the STB's methodology in valuing the rail line's net salvage value; it contends that, instead of applying a monthly average, the STB should have valued the salvage material at current market prices. Second, TP&W submits that the STB erroneously permitted KJRY to submit Mooty's real estate appraisal with its reply brief; even if this valuation was properly submitted to the STB, TP&W continues, the STB should have afforded TP&W an opportunity to respond to this new evidence and to submit the updated land valuation analysis performed by Gray and Borstein. Third, TP&W challenges the STB's determination that tax credits should not be taken into account in calculating a rail line's NLV. We address each claim in turn.

### A. Valuation of Scrap Steel

TP&W first contends that the STB's methodology in pricing its scrap steel is contrary to the general rule that a property owner is entitled to the "fair market value of its property as of *the date of the taking*." Petitioner's Br. at 22 (emphasis in original). Because the STB's methodology departs from "prior agency precedent without proper explanation," TP&W urges us to find the STB's valuation of the line "arbitrary and capricious." *Id.* at 26.[16]

---

[16] TP&W also contends in its brief on appeal that the STB's valuation of the scrap steel violates the Fifth Amendment's guarantee that an owner receive just compensation for its property. *See* Petitioner's Br. at 22. However, after careful review

(continued...)

We afford substantial deference to the STB's interpretation
of the statutes and regulations it administers, including 49
U.S.C. § 10907. Although section 10907(c)(1) explicitly sets
forth a number of prerequisites to approval of the sale of a
rail line, the statute largely is silent with respect to valua-
tion: section (b)(2) specifies that the constitutional minimum
value of a line is "not less than the net liquidation value of
such line or the going concern value of such line, whichever
is greater," *id.* § 10907(b)(2), but it does not speak to what
constitutes, or the factors that affect, the calculation of the
line's going concern or net liquidation value. "When a
statute is found to be either silent or ambiguous, the court
must uphold the agency's interpretation if it is based on a
'permissible construction of the statute.' Courts generally
defer to agency expertise when interpreting vague or
incomplete statutes." *Johnson v. Apfel*, 191 F.3d 770, 774 (7th
Cir. 1999) (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def.
Council, Inc.*, 467 U.S. 837, 843 (1984)).

---

(...continued)
of the record, we believe that TP&W has waived this argument.
In its petition for reconsideration, TP&W contended that the
STB's decision to "average the price of scrap steel over a time
period" was contrary to agency precedent, including the STB's
decision in *LaPorte Abandonment.* A.R. 212639 at 17. Specifically,
TP&W claimed that the STB previously only has averaged
prices where the value of scrap metal "had been falling," which
did not occur in this case. *Id.* Because TP&W did not raise a
Fifth Amendment challenge to the STB's valuation methodology
in agency proceedings, we decline to address this dimension of
their argument on appeal. *See Ester v. Principi*, 250 F.3d 1068, 1072
(7th Cir. 2001) (holding that arguments "not made before the
administrative agency are subsequently waived before the
courts" (citing *United States v. L.A. Tucker Truck Lines, Inc.*, 344
U.S. 33, 37 (1952))).

As a result, our review of the STB's valuation of a rail line's constitutional minimum value is narrow. *See Decatur County Comm'rs v. Surface Transp. Bd.*, 308 F.3d 710, 714 (7th Cir. 2002). We "give considerable weight and due deference to the [STB's] interpretation of [49 U.S.C. § 10907(b)] unless its statutory construction is plainly unreasonable." *R.R. Ventures, Inc. v. Surface Transp. Bd.*, 299 F.3d 523, 548 (6th Cir. 2002) (internal quotation marks omitted; first alteration in original); *see also Decatur County Comm'rs,* 308 F.3d at 714. Moreover, we shall not set aside the STB's factual findings unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction[;] . . . or unsupported by substantial evidence . . . ." 5 U.S.C. § 706(2)(A)-(E); *see also Caddo Antoine & Little Missouri R.R. Co. v. United States*, 95 F.3d 740, 746 (8th Cir. 1996) (holding that, to overturn the STB's valuation of a rail line, there must be "compelling indications that the [STB's] interpretation is incorrect"); *Missouri Pac. R.R. Co. v. I.C.C.*, 23 F.3d 531, 533 (D.C. Cir. 1994) ("The court has only limited scope to review the substantive validity of the [STB's] decision: we must affirm unless that decision is arbitrary and capricious, exceeds the [STB's] authority, or diverges without explanation from agency precedent." (internal quotation marks omitted)); *R.R. Ventures*, 299 F.3d at 558 (noting that this standard of review "generally requires affirmance of the STB's valuation decisions"). "A decision is not arbitrary or capricious when it is possible to offer a reasoned, evidence-based explanation for a particular outcome." *R.R. Ventures*, 299 F.3d at 548; *see Highway J Citizens Group v. Mineta*, 349 F.3d 938, 953 (7th Cir. 2003) (holding that, "[i]f an agency considers the proper factors and makes a factual determination" that a particular result is compelled, "that decision

implicates substantial agency expertise and is entitled to deference").[17]

In this case, the methodology employed by the STB in calculating the net salvage value of TP&W's rail line was reasonable, and not arbitrary or capricious or otherwise not in accordance with the law. The STB found that prices for steel had been extremely volatile over the course of the proceedings. Consequently, it concluded that calculating the statutory constitutional minimum value of the line by averaging the price of steel from April 2003 to July 2004, as opposed to applying the market price of steel on the date of final sale, more accurately reflected the line's probable value on the open market than did the artificially inflated market price of steel as of November 1, 2004. That decision was

_____

[17] *See also Borough of Columbia v. Surface Transp. Bd.*, 342 F.3d 222, 235 (3d Cir. 2003) (in evaluating petitioner's Fifth Amendment claim, deferring to the STB's determination and noting that it is "loath to second-guess the factual determinations of the agency to which Congress has assigned decision-making responsibility"); *GS Roofing Prods. Co. v. Surface Transp. Bd.*, 262 F.3d 767, 774 (8th Cir. 2001) (in the context of reviewing the calculation of constitutional minimum value under § 10907, noting that the "scope of review . . . is narrow" and that courts "are required to give considerable deference to the Board's interpretation" and "will not disturb the Board's decision absent compelling indications that the Board's interpretations were incorrect"); *Iowa Terminal R.R. Co. v. I.C.C.*, 853 F.2d 965, 969-71 (D.C. Cir. 1988) (reviewing the Board's valuation order to determine whether it was "arbitrary or capricious").

TP&W's only argument to the contrary—that we review all allegations of constitutional error by the STB de novo—is inapplicable; any constitutional error was not adequately preserved by TP&W for appeal. *See supra* n.16.

justified by the STB's careful consideration of a number of factors, most notably the widely-fluctuating price of steel.[18] The evidence submitted by the parties prior to the STB's final decision indicates that the steel market was unstable while STB proceedings were ongoing, marked by significant price shifts within short periods of time. *See* TP&W's Petition for Reconsideration, A.R. 212639, Ex.E (setting forth the market value of scrap and reroll steel over the course of seven months, from April to November 2004); KJRY's Reply to TP&W's Reroll Value Evidence, A.R. 212724; *see also id.,* Ex.1. Our role is not to reweigh this evidence, but to determine whether the STB's conclusions regarding market fluctuation are supported by substantial evidence.[19] The STB's conclusion finds such support in the revised valuations submitted by the parties after the record had closed and in the updated data submitted by the parties with respect to the petition for reconsideration. *See Howard Young Med. Ctr., Inc. v. Shalala*, 207 F.3d 437, 441 (7th Cir. 2000) ("We are not permitted to reweigh the evidence or to substitute our own judgment for that of the administrative agency."); *see also W. Coal Traffic League v. Surface Transp. Bd.*, 169 F.3d 775, 780-81 (D.C. Cir. 1999) (upholding the STB's determination even when "evidence to the

---

[18] TP&W has not challenged the STB's findings on the volatility of steel prices.

[19] This is especially true given that the statute and regulations do not require the valuation of track materials at the market price as of the date of taking or sale. *Cf. Howard Young Med. Ctr., Inc. v. Shalala*, 207 F.3d 437, 442 (7th Cir. 2000) (holding that, because the Secretary of Health and Human Services was not required by statute or regulation to interpret the data submitted in a particular fashion, it was appropriate to defer to the agency's interpretation of that data).

contrary" was "substantial" because "evidence supporting the Board's conclusion [also was] substantial").

We take note of TP&W's argument that *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1 (1984), requires valuation of property "at the time of the taking," *id.* at 10, which, in turn, was defined by the Court as the date of "payment of the condemnation award," *id.* at 14; *see also* Petitioner's Br. at 22-24. In *Kirby Forest*, the Supreme Court addressed when a taking of property by use of the "straight-condemnation" procedure provided in 40 U.S.C. § 257 "should be deemed to occur" for purposes of valuing the land. *Kirby Forest*, 467 U.S. at 9. Just compensation, the Supreme Court held, "means in most cases the fair market value of the property on the date it is appropriated." *Id.* at 10. In the context of straight-condemnation proceedings, it concluded, the date on which the property is appropriated is the date on which "the United States tenders payment to the owner of the land." *Id.* at 11.

Relying on this analysis, TP&W contends that the date of taking in this case was on or about February 7, 2005, and that the STB was required to calculate the value of the line according to market conditions on that date. TP&W, however, did not cite *Kirby Forest* before the STB and, in fact, urged the STB to calculate the market price of steel as of November 1, 2004, the date of the STB's valuation decision, not as of February 7, 2005, the date that the sale of TP&W's line to KJRY became final. *See* Petition for Reconsideration, A.R. 212639 at 18 (urging the STB to value the track and materials at market value "as of November 1, 2004, the date nearest the service of the [STB's October decision] and the date on which Mr. [G]arvin would voluntarily sell the scrap steel"). TP&W therefore has waived this argument. *See Ester v. Principi*, 250 F.3d 1068, 1072 (7th Cir. 2001) (holding that

arguments "not made before the administrative agency are subsequently waived before the courts" (citing *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952))).

Even if we were to reach the merits of TP&W's argument, we would find it lacking. *Kirby Forest* involved a factual scenario that is not analogous to the present case. The Supreme Court went to great lengths to distinguish the facts presented in *Kirby Forest* from similar scenarios unaffected by its holding; it even noted that "[n]one of the discussion in this opinion is intended to modify either the manner in which the fair-market-value standard is interpreted and applied or the test for determining when the fair-market-value standard must be supplanted by other formulae." *Kirby Forest,* 467 U.S. at 10 n.15. Specifically, it recognized that there are two scenarios in which "[j]ust compensation" does not mean "the fair market value of the property on the date it is appropriated." *Id.* at 10 (internal quotation marks omitted). "Other measures of 'just compensation,'" the Court explained, "are employed . . . when market value [is] too difficult to find, or when its application would result in a manifest injustice to owner or public." *Id.* at 10 n.14 (internal quotation marks omitted; second alteration in original). Although the STB did not address *Kirby Forest* specifically, its rationale mirrors the Supreme Court's analysis: In effect, the STB determined that, in this case, market value was too difficult to ascertain and price-averaging would be more fair to the parties. Specifically, the STB reasonably determined that, because of unusual market volatility, a traditional just compensation model was not appropriate. Market fluctuation over the course of proceedings made it "too difficult" to pinpoint the fair market value of TP&W's materials. *Id.* Moreover, the inflated prices of steel on the date of final sale and on the date of appropriation meant that market value on those dates, according to

the STB, did not represent the fair market value of TP&W's assets and would result in "manifest injustice" to the purchaser, KJRY. *Id.* The price of steel almost had doubled between April 2003, the date that the feeder line application was filed, and November 2004, the date of final decision; the STB therefore determined that it was appropriate to supplant the fair-market standard with another formula, one that averaged steel prices over a fourteen-month period. *See* Petitioner's App., Ex.B at 12 (holding that price-averaging "protect[s] sellers from dramatic price reductions and buyers from dramatic price increases"). Given the STB's careful consideration of the matter of just compensation, we cannot agree that the Supreme Court's decision in *Kirby Forest* renders the STB's methodology in this case arbitrary and capricious.

TP&W also submits that the STB's methodology is inconsistent with agency precedent. *See, e.g., CSX Transport, Inc.—Abandonment Exception—In LaPorte, Porter & Starke Counties, Indiana*, STB Docket No. AB-55, 2004 WL 933330 (April 30, 2004) (hereinafter "*LaPorte*"). In *LaPorte*, the Town of North Judson ("Town") submitted an offer of financial assistance ("OFA"), *see* 49 U.S.C. § 10904, to purchase a portion of a rail line owned by CSX Transportation, Inc. Because the parties were unable to reach agreement on the sale of the line, the Town requested that the STB set the terms of sale. *See* 49 U.S.C. § 10904(e). CSX proposed a purchase price that was higher than the price it had suggested in prior negotiations and alleged that the price of scrap steel had risen steeply. The Town filed a motion to strike the evidence offered by CSX to demonstrate the increased value of the line, claiming that CSX wrongfully withheld this information until late in the proceedings. *See LaPorte*, 2004 WL 933330, at *1. The STB held that, although it generally

disfavors a party's later introduction of evidence that could have been presented in its initial pleading (particularly in OFA proceedings where the statutory time frames are short), the recent sharp increase in the price of scrap steel warrants consideration of the new evidence in light of the [STB's] duty to set a purchase price for the line that is no lower than the constitutional minimum value.

*Id.* at *2.

The STB's analysis in *LaPorte* does not constrain its choice of methodology in pricing TP&W's line in the present case. "[OFA] statutory time frames are short" and the proceedings transpire rapidly, *id.*; the regulations in *LaPorte* set a 30-day deadline on the submission of offers of financial assistance and on the submission of a request for the STB to establish the terms of sale after the parties fail to reach agreement, *see* 49 C.F.R. § 1152.27. As a result, market data submitted by parties in OFA proceedings, including the parties in *LaPorte*, is largely contemporaneous with the market conditions that existed both at the commencement of the litigation and at the time of final decision. By contrast, when litigation is more lengthy, it is likely that there will be a significant market shift in the price of steel between the date that proceedings are commenced and the date of final sale or taking (as occurred in the present case). Such a shift renders the selection of a date on which to price the steel arbitrary and makes price-averaging a reasonable alternative to traditional valuation schemes. Under similar circumstances, in fact, the STB has averaged prices to account for market fluctuations during feeder line proceedings. *See, e.g., Chicago & N.W. Transp. Co.—Abandonment between Ringwood, Illinois & Geneva, Wisconsin*, 363 I.C.C. 956, 960 (1988) (averaging prices for salvage over a six-month period,

finding that current market prices "exaggerate[d] the value of the reusable rail involved"); *Chicago & N.W. Transp. Co.—Abandonment between Marshalltown (Powerville) & Cedar Falls Junction & between Hicks and Dike—in Marshall, Tama, Grundy & Blackhawk Counties, Iowa*, 1988 WL 225134, at *11 (STB Dec. 7, 1988) ("[The railroad] replies that it used the most recent 6-month average of scrap prices actually received . . . , a procedure accepted in numerous other abandonment cases . . . . [It] has presented a reasonable estimate for the value of its rail, supported by adequate justification of its methodology."); *cf. GS Roofing*, 262 F.3d at 776 (affirming the STB's use of system-wide averages, rather than line-specific data, due to the lack of information and noting that, although this practice was not "preferable," it also could not be considered arbitrary or capricious). In fact, the STB has noted that "[u]se of a 6-month average to determine NLV for track . . . is accepted methodology." *Chicago & N.W. Transp. Co.—Abandonment Between Steamboat Rock & Hampton in Hardin & Franklin Counties, Iowa*, STB Docket No. AB-1, 1989 WL 238616, at *2 n.5 (1989).[20]

---

[20] On appeal, TP&W contends that the STB's choice of dates by which to calculate a fourteen-month average price of steel was unreasonable and arbitrary. Specifically, it argues that the starting date of the fourteen-month average, April 2003, was improper because "KJRY did not even file a proper application until June of 2003." Petitioner's Br. at 29. TP&W further contends that the ending date of the monthly average, July 2004, has no particular relevance to the case but rather is merely the last month of available data. These arguments, however, were not made in STB proceedings. In its petition for reconsideration, TP&W contended that the STB "failed to follow its own precedent in averaging the value of scrap steel," A.R. 212639 at 17, and

(continued...)

In sum, because of unpredictable market conditions during the course of this litigation and the unpredictability of the date of final sale, and because this approach is consistent with both Supreme Court and agency precedent, we conclude that the STB's price-averaging methodology was not arbitrary or capricious.

## B. Tax Credits

TP&W next contends that the STB erred in refusing to consider the value of tax credits under the American Jobs Creation Act of 2004, 26 U.S.C. § 45G, in its determination of the line's constitutional minimum value. The American Jobs Creation Act permits a railroad to take a credit "equal to 50 percent of the qualified railroad track maintenance expenditures paid or incurred by an eligible taxpayer during the taxable year," not to exceed $3,500

> multiplied by [] the sum of—[] the number of miles of railroad track owned or leased by the eligible taxpayer as of the close of the taxable year, and [] the number of miles of railroad track assigned for purposes of this subsection to the eligible taxpayer by a Class II or Class III railroad which owns or leases such railroad track as of the close of the taxable year.

26 U.S.C. § 45G(a), (b)(1). According to TP&W, its anticipated future investment in its rail line would entitle it to

---

(...continued)

noted that the STB should have used a six-month, rather than fourteen-month, average, *see id.* at 18; it did not argue that the specific starting and ending dates utilized by the STB were arbitrary or otherwise unreasonable. We therefore deem the argument waived and do not reach the matter on appeal.

approximately $874,650 in tax credits over a three-year period—an amount it contends should be taken into account in determining the line's constitutional minimum value.[21]

The STB held that tax credits should not be considered in calculating the constitutional minimum value of the line under 49 U.S.C. § 10907, both because tax credits are non-physical assets of the line, and therefore not part of the line's liquidated value, and because the STB found that it was "speculative at best . . . whether TP&W would actually spend the funds necessary to entitle it or its corporate parent to a tax credit, much less the maximum tax credit." Petitioner's App., Ex.B at 13. As discussed previously, we shall reverse the STB's legal interpretation of a statute it is charged with administering only if it is arbitrary and capricious—in other words, if there are "compelling indications that the [STB's] interpretation is incorrect."

---

[21] TP&W also argues on appeal that the "[STB's] refusal to account for the value of tax credits in determining the Line's market value violated the Fifth Amendment." Petitioner's Br. at 37 (urging this court to review its claim of constitutional error de novo). However, TP&W did not raise its Fifth Amendment claim in agency proceedings: In its petition for reconsideration, TP&W argued only that standard valuation procedures required the STB to take into account tax credits for maintenance expenditures under the newly enacted American Jobs Creation Act. *See* Petition for Reconsideration, A.R. 212639 at 19. For this reason, TP&W's argument that failure to account for tax credits under 26 U.S.C. § 45G violates its Fifth Amendment right to just compensation has been waived. Even if this argument was not waived, the above analysis demonstrates that the STB's refusal to consider the value of potential tax credits for maintenance of the line did not violate any constitutional guarantees.

*Caddo Antoine & Little Missouri R.R.*, 95 F.3d at 746 (internal quotation marks omitted). We review the STB's factual finding that TP&W did not plan to invest necessary funds in the line "for substantial evidence." *Cross v. Dep't of Transp.*, 127 F.3d 1443, 1448 (Fed. Cir. 1997) ("We do not substitute our judgment for that of the board as to the weight of the evidence or the inferences to be drawn therefrom.").

The STB did not err in refusing to consider future tax credits available under 26 U.S.C. § 45G in calculating the net liquidation value of TP&W's rail line. Tax credits may be a proper consideration in calculating a line's going concern value, under which the line will continue to operate in a profitable manner. However, when "there is no evidence of a higher going concern value for continued rail use," the STB calculates a line's constitutional minimum value by evaluating its net liquidation value, the property's "highest and best nonrail use." *New York Cent. Lines, LLC—Abandonment Exemption—In Berkshire County, Mass.*, STB Docket No. AB-565, 2002 WL 599179, at *2 (April 18, 2002). In that scenario, the STB is to calculate the sale price "on the basis of what the seller would have realized from the sale of the assets had the line in fact been abandoned," the track materials salvaged and the land sold. *Iowa Terminal R.R. Co. v. I.C.C.*, 853 F.2d 965, 969 (D.C. Cir. 1988).

TP&W does not dispute that, but for the feeder line application, it would have abandoned the La Harpe-Hollis Line, selling its track and rail materials for scrap. The line, with the exception of the Mapleton Spur, which TP&W will retain post-sale, no longer earns a profit and therefore has no going concern value.[22] Therefore, TP&W should be

---

[22] As the STB explained,

(continued...)

compensated only for the " 'the nonrail market value of [its] assets.' " *Id.* (quoting *Chicago & N.W. Transp. Co. v. United States,* 678 F.2d 665, 668 (7th Cir. 1982) (alteration in original)). Non-physical assets are not an appropriate consideration in this calculation: " 'The purpose of [section 10905] would be frustrated if the Commission were required to consider the value of the [line] to the offeror' as part of an operating railway rather than the price the seller would have received from the sale of the [line] for nonrail uses." *Id.* (quoting *Chicago & N.W. Transp. Co.,* 678 F.2d at 668) (first alteration in original).

As a result, savings realized from tax credits are not part of the line's net liquidation value. As the D.C. Circuit explained in *Iowa Terminal Railroad*:

> Petitioner argues, on appeal, that it is at least entitled to the benefit of the tax savings it would have realized had it been able to deduct the value of the right-of-way as a charitable gift in its income tax returns. Such a position

---

[22] (...continued)

> TP&W and KJRY agree that the traffic originating or terminating on the Western Segment is inadequate to give it a GCV that is higher than NLV, and it is not apparent how the Eastern Segment, without the Mapleton Spur traffic, could have a GCV higher than NLV. The Eastern Segment neither originates nor terminates traffic; its only value to TP&W is in the access it provides to the traffic-heavy Mapleton Spur. With TP&W retaining ownership of, exclusive access to, and all the revenues from, the Mapleton Spur, and receiving virtually cost-free trackage rights to continue serving the Spur, the Eastern Segment cannot have a separate, higher GCV.

Petitioner's App., Ex.A at 11.

> stretches the statute too far. Subsection 10905(f)(1)(C) requires the [STB] to determine the fair market value of an asset to a nonrail purchaser, not its after-tax value to the vendor.

*Id.* at 969 (internal citations omitted). In sum, because the parties agree that the line's constitutional minimum value should be calculated using a net liquidation formula rather than a going concern formula, and because TP&W does not contest that the line's highest and best nonrail use requires sale of the land and salvage of the track and materials, we simply cannot understand why it would be appropriate to compensate TP&W for prospective tax credits, which assume, and indeed require, continued operation of the line.

Moreover, even if tax credits were an appropriate consideration in calculating a line's NLV, they are not an appropriate consideration in this case. TP&W apparently concedes that it does not plan to invest over half a million dollars per year in maintaining the 76 miles of track that it owns or leases as part of the La Harpe-Hollis Line, the sum necessary to render it eligible for $874,650 in tax credits over the three-year period. It instead contends that it is entitled to tax credits for maintenance it expects to perform elsewhere on its system. According to TP&W, it planned to invest $1,981,000 system-wide on the 283 miles it owns or leases per year, entitling it to a yearly tax credit of $990,500, $291,550 of which is attributable to railroad track owned or leased as part of the La Harpe-Hollis Line. But TP&W's only evidence on this subject relates exclusively to what TP&W's maintenance *budget* is; there is no evidence that TP&W actually has invested, or would invest, the sum claimed on maintaining its rail lines.

Nor is there evidence that TP&W planned to keep the La Harpe-Hollis Line long enough to accrue the relevant tax credits. The sum of tax credits claimed by TP&W—$874,650—assumes that TP&W would retain and invest in the line for three years. But TP&W previously attempted to sell the line as salvage to SF&L, and even its Chief Engineer, Mark Garvin, stated that, given high steel prices, TP&W—if permitted by the STB—would have abandoned the line and sold the track and materials for scrap. *See* Petition for Reconsideration, A.R. 212639 at 18 (noting that November 1, 2004, is the date closest to when "Mr. [G]arvin would [have] voluntarily [sold] the [line for] scrap steel").

We therefore reject the claim that the STB should have compensated TP&W for the value of tax credits to which TP&W allegedly was entitled under 26 U.S.C. § 45G.

## C. Land Title Analysis

TP&W contends that the STB erred in permitting KJRY to submit Mooty's real estate appraisal for the first time on rebuttal. TP&W further submits that, because KJRY was permitted to submit Mooty's analysis in an untimely fashion, the STB was required to offer TP&W an opportunity to rebut Mooty's methodology and conclusions. According to TP&W, the STB therefore erred in excluding Gray and Borstein's land title analysis, submitted by TP&W with its petition for reconsideration.

TP&W's argument that the STB erred in permitting KJRY to submit a new real estate analysis along with its reply brief has not been preserved properly for our review. At no time prior to the STB's October 2004 decision did TP&W object to KJRY's submissions; TP&W instead waited to raise the

argument until the STB had issued an unfavorable decision. Although TP&W is correct that the rules do not permit the filing of a reply to a reply, *see* 49 C.F.R. § 1104.13(c), it could have filed a motion to strike Mooty's appraisal,[23] or petitioned the STB to respond to that appraisal. We therefore deem the argument waived. *See Ester*, 250 F.3d at 1072.[24]

---

[23] TP&W appears to have been aware of the standards governing the supplementation of the record; indeed, it previously had requested that the STB allow the introduction of updated evidence and materials. *See* A.R. 210184 at 4 (petitioning the STB to supplement the record with updated steel prices and noting that the STB has discretion to allow the record to be supplemented when the information is "central to the petitioning party's case" and other relevant requirements are met). Similarly, the STB previously had indicated its willingness to grant TP&W's requests to supplement the record. At the very least, this suggests that TP&W knew that it could request permission from the STB to respond to Mooty's analysis and to submit Gray and Borstein's appraisal prior to the record's closing.

[24] TP&W contends that, because STB regulations require KJRY to provide an estimate of " 'NLV and GCV of the line' " in its " 'initial application,' " Petitioner's Br. at 33 (citing 49 C.F.R. § 1151.3), and because "KJRY submitted no real estate analysis, or evidence supporting such an analysis, in its opening application," the STB was "bound to accept Cecil's valuation because it was the only timely credible evidence before [it]," *id.* at 34. This is a mischaracterization of the proceedings. KJRY did submit with its initial application a real estate analysis, which was based on the best evidence available to it at that time; this analysis included a preliminary statement about TP&W's land holdings, and noted that necessary documents, including TP&W's deeds and valuation charts, had not been produced as requested, hindering its ability to perform a traditional real estate appraisal.

(continued...)

We also cannot accept TP&W's argument that the STB erred in excluding Gray and Borstein's land title analysis, which was offered by TP&W along with its November 2004 petition for reconsideration. The STB held that this evidence was untimely filed and, because it was not based on "newly available evidence," did not warrant reconsideration of its prior decision. Petitioner's App., Ex.B at 5. We review the STB's denial of a petition for reconsideration for abuse of discretion. *See Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd.*, 252 F.3d 246, 260 (3d Cir. 2001).

The STB did not abuse its discretion in refusing to consider Gray and Borstein's land title analysis. As an initial matter, contrary to TP&W's contention, the STB is not

---

(...continued)

As required by STB regulations, *see* 49 C.F.R. § 1151.2(d)(1), along with its feeder line application, KJRY therefore filed discovery requests, asking TP&W for copies of these documents. In submitting Mooty's analysis on rebuttal after receiving the relevant materials, KJRY merely was updating its previously-submitted, incomplete analysis—a matter over which the STB retains substantial discretion. *See Delta Airlines, Inc. v. Civil Aeronautics Bd.*, 561 F.2d 293, 307 (D.C. Cir. 1977) ("[S]upplementation [of the record], in whatever form, is a matter entrusted to agency discretion."). The STB was within its discretion in accepting this newly-submitted evidence; 49 C.F.R. § 1151.2(d)(1) allows the filing of an "incomplete application" and later supplementation of the record "[i]f [the] applicant . . . is unable to obtain required information that is primarily or exclusively within the personal knowledge of the owning carrier . . . if it files at the same time a request for discovery under 49 CFR part 1114 to obtain the needed information from the owning carrier."

constitutionally required to consider *all* evidence submitted prior to the date of taking, when that evidence is offered in an untimely fashion. *See* Petitioner's Br. at 31 (maintaining that the STB must consider all evidence on the topic of the line's constitutional value, "even if it cause[s] inconvenience to the Board"). Title 49 of the United States Code at § 722 requires the STB to grant "reconsideration of an action" only when there is "material error, new evidence, or substantially changed circumstances." 49 U.S.C. § 722(c)(2). As the STB has explained previously:

> [T]he Board generally does not consider new issues raised for the first time on reconsideration where those issues could have and should have been presented in the earlier stages of the proceeding. Moreover, the term "new evidence" refers to evidence that was not reasonably available to the party when the record was developed, and not simply newly raised. Nothing in the statute or the [STB's] regulations obliges the agency to rethink its decisions whenever a party wishes to try out a new theory or finds new information at a late stage in the process. And if a party were free to reshape its case, so long as it did so within 20 days after a decision, the administrative process might never end. The agency is not expected to behave like Penelope, unraveling each day's work to start the web again the next day.

*Texas Mun. Power Agency v. Burlington N. & Sante Fe R.R. Co.,* STB Docket No. 42056, 2004 WL 2619767, at *2 (Sept. 24, 2004) (internal citations and quotation marks omitted); *see also Canadian Nat'l Ry. Co., Grand Trunk Corp., & Grand Trunk W. R.R., Inc.—Control—Ill. Cent. Corp., Ill. Cent. R.R. Co., Chicago, Cent. & Pac. R.R. Co., & Cedar River R.R. Co.,* STB Docket No. 33556, 2002 WL 1969505, at *4 (Aug. 23, 2002) (holding that, to be considered after the STB issues a final

decision, the offering party must demonstrate that the new evidence not only is "newly presented" but also is "evidence that could not have been foreseen or planned for at the time of the original proceeding").

TP&W does not contend that the Gray and Borstein land title analysis constitutes "evidence that could not have been foreseen or planned for at the time of the original proceeding." *Id.* Gray and Borstein relied on the same evidence—deeds, real estate maps and other valuation documents—that Mooty had cited in his appraisal and that were submitted with TP&W's real estate appraisal authored by Cecil and filed in a timely manner. Obviously, these documents were "reasonably available to the party when the record was developed," *Texas Mun. Power Agency*, 2004 WL 2619767, at *2; indeed, these documents were *part of the record* long before the record closed and the STB issued its final decision. Moreover, there is no valid reason why TP&W did not employ Gray and Borstein to perform a land title analysis while preparing its materials for its response brief, or, if not then, after KJRY submitted Mooty's analysis but before the record closed. Because "evidence that was reasonably available to the parties before the proceeding is not new evidence for purposes of [49 U.S.C. § 722]," and because Gray and Borstein's land title analysis raised before the STB "the same substance" as had and could have been raised earlier, we believe that the STB did not abuse its discretion in granting KJRY's motion to strike this evidence. *Friends of Sierra R.R., Inc. v. I.C.C.*, 881 F.2d 663, 667 (9th Cir. 1989) (internal quotation marks omitted).

**Conclusion**

For the reasons set forth in the foregoing opinion, we deny TP&W's petition for review of the STB's order.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*